THE COMMONWEALTH OF VIRGINIA *vs.* THE STATE OF MARYLAND, THE CHESAPEAKE AND OHIO CANAL COMPANY, WILLIAM W. CORCORAN and others, Trustees, and JOHN S. GITTINGS, ALLEN BOWIE DAVIS and others, Bondholders.

*Order of Priority in the payment of the Bonds of the Chesapeake and Ohio Canal Company — Creditors of the Potomac Company — Repair bonds — Preferred bonds, issued under the Act of 1844, ch. 281 — Claim of Selden, Withers & Co., assigned to Virginia — Liens and Claims of the State of Maryland — Rights under a Charter — Construction of the Act of 1844, ch. 281 — Holders of Coupon bonds issued under a Statute, chargeable with knowledge of the provisions of the Statute and its true Judicial construction — Liberal rules of Interpretation to be applied in expounding the privileges, &c., of the Chesapeake and Ohio Canal Company — Rights of a Guarantor — Subrogation — Negotiability of Coupon bonds payable to bearer — Interest recoverable on Interest Coupons from their maturity, against the Corporation which issues them — Provision in an Act of Assembly waiving the State's Liens in favor of other Creditors, construed.*

The Chesapeake and Ohio Canal Company having received from tolls and revenues, a surplus applicable to the payment of its preferred or lien creditors, a bill in equity was filed to which the several classes of such creditors, contesting priorities *inter sese* as well as against the State of Maryland, were made parties. The object of the suit and of the parties was to obtain an adjudication of these priorities, so as to determine the application of this and other like surplus revenue hereafter to accrue. The questions presented depend upon the construction of the several laws of Congress, Virginia and Maryland chartering and aiding this

Commonwealth of Virginia *vs.* Ches. & Ohio Canal Co., *et al.*

company, the mortgages executed by it to secure the various loans it had contracted, the purposes to which the money raised by such loans was applied and the powers conferred upon the company by its original and supplemental charters; and it was by the Court, HELD:

1st. That the creditors of the old Potomac Company, by accepting the bonds of the Canal Company issued to them on the terms prescribed in certain resolutions of that company, as a full satisfaction of their claims, lost any lien or priority, they may have had resting upon the obligations in their favor imposed by the original charter of the Canal Company, what they thus accepted and received being substantially different both in amount and security from what they were entitled to under that charter.

2d. But these creditors are entitled to a lien on the tolls and revenues of the Canal to the extent of $5,000, per annum, in the order of preference assigned to them by the Act of 1844, ch. 281, being prior to the liens of the State of Maryland, but subsequent to the interest due, and in arrear on the Preferred construction bonds, authorized to be issued by that Act.

3d. The Repair bonds of $200,000, in amount, guaranteed by the State of Virginia and constituting a loan effected in 1849, and expended in repairing and fitting for transportation a portion of the Canal, constitute the first lien on these tolls and revenues, and are at present entitled to priority of payment over every other claim.

4th. These Repair bonds being now due and the interest coupons thereon having remained unpaid in part by Virginia, as guarantor, the order of payment out of the revenues of the Canal, is to pay first all the over-due coupons, not paid by Virginia, then the principal of the bonds and then to re-pay to Virginia what she has paid, as guarantor.

5th. The Preferred bonds issued under the Act of 1844, ch. 281, of which a part were also guaranteed by Virginia, stand next in priority, and by that Act have preference over the liens of the State of Maryland.

6th. The principal of these bonds not being yet due, all the over-due interest coupons thereon, must be paid in the order of seniority whether taken up and paid by Virginia as guarantor or not.

7th. The arrangement between the Canal Company and Selden, Withers & Co., for payment of the interest on the Preferred bonds for the years 1851 and 1852, was in effect an advance or loan of money by that firm to the company to enable it to pay and extinguish that portion of its interest debt.

8th. The coupons for those years were both in fact and in law paid and extinguished by the Canal Company, with their money borrowed from that firm and applied for that express purpose, and that firm was not

Commonwealth of Virginia *vs.* Ches. & Ohio Canal Co., *et al.*

by this transaction subrogated to the rights of the original holders of the coupons thus paid.

9th. Interest on the over-due coupons of both the Repair and Preferred bonds, though recoverable against the Canal Company, cannot be paid before the liens of the State of Maryland; the waiver of the State's liens in the Act of 1844, ch. 281, being only in favor of the bonds and *simple* interest thereon.

10th. After the liens above stated shall have been paid, the entire surplus revenues of the Canal Company must be applied in discharge of the principal and interest of the liens and claims of the State of Maryland.

Where the charter of a new corporation provided for the surrender and transfer of the rights and franchises of a prior corporation, with its assent, on certain conditions in favor of the stockholders and creditors of the latter; these conditions cannot be abrogated or impaired without the consent of such stockholders and creditors, by any subsequent acts of the new corporation or the law making power which created it.

The Act of 1844, ch. 281, authorizing the issue of the Preferred bonds, making them preferred liens on the tolls and revenue of the Canal, and pledging the same to their payment, contains a proviso, that the " President and Directors of the Canal Company shall from time to time and at all times hereafter, have the *privilege* and *authority* to *use* and *apply* such portion of said revenues and tolls as in their opinion may be necessary to *put* and *keep* said Canal in good condition and repair for transportation, provide the requisite supply of water and pay the salaries of officers and agents and the current expenses of the said company." HELD:

1st. That by this the company is not restricted to the use of receipts in hand when there is occasion for repairs, but if an emergency for repairs arises to meet which such receipts are insufficient, they can anticipate them, and under the powers granted by the charter, may issue bonds for the purpose, on the pledge of future revenues in preference to any other claim or lien thereon.

2d. And if a subsequent emergency shall arise for another loan for the same purpose of repair, the same power may be exercised and the debt thus created will have priority over all other liens including those for previous repairs.

Where coupon bonds payable to bearer, on their face refer to the Act of Assembly, a public statute of a State, under which they purpose to be issued, those who take them are in law chargeable with knowledge of all the provisions of such statute and of the true construction to be placed upon them by the Courts.

Commonwealth of Virginia *vs.* Ches. & Ohio Canal Co., *et al.*

The Chesapeake and Ohio Canal Company though a private corporation as distinguished from a public municipal body, yet being designed to promote great public interests, liberal rules of interpretation for its benefit must be adopted in expounding its granted privileges, rights and powers.

A guarantor having paid part of the debt of the principal debtor for which the guaranty was given, cannot claim re-imbursement out of the funds of such debtor, until the debt of the common creditor is fully satisfied.

Where a party at the instance of a mortgagor pays part of the mortgage debt, but takes no assignment of the mortgage, he is not by such payment subrogated to the right of the mortgagee as against a subsequent mortgage; to effect such subrogation there must be something more than mere payment and silent receipt of the money by the first mortgagee.

It is a settled doctrine of American law that coupon bonds payable to bearer issued by a corporation under proper authority, have all the qualities of commercial paper and are negotiable instruments.

Coupons attached to such bonds being contracts for the payment of a definite sum of money on a given day, may be sued on without producing the bonds, and interest thereon recovered against the corporation from their maturity.

An Act of Assembly waiving the State's liens in favor of other creditors of a corporation, in which the State is interested, is to be construed by the same rules that govern the interpretation of other statutes; its terms cannot be extended by construction beyond the plain natural signification and import of the language used.

A provision in such a statute waiving the State's liens in favor of certain bonds to be issued "so as to make said bonds and interest to accrue thereon" preferred liens "until said bonds and *interest* shall be fully paid" is a waiver only in favor of the bonded debt and *simple interest* that may accrue thereon, and does not extend to interest that may accrue on interest coupons attached to such bonds.

APPEAL from the Circuit Court of Baltimore City.

The bill in this case was filed by the appellant on the 21st of December, 1867, against the Chesapeake and Ohio Canal Company—William W. Corcoran, George W. Riggs, J. B. H. Smith, Horatio Allen and J. Philip Roman, trustees of the preferred bondholders, and John S. Gittings, Allen Bowie Davis, Charles H. Carter and Mrs. Isabella Brown, bondholders.

Its object was to procure a decree determining the legal and equitable priorities of the holders of the various classes of bonds issued by the Chesapeake and Ohio Canal Company; ordering their payment accordingly out of the revenues of the company properly applicable to such payment, and the granting, in the meantime, of an injunction restraining the company from applying its net revenues to any other purpose than the discharge of the prior liens thereon of the complainant, as alleged in her bill. Subsequently, by agreement, William Price and William H. Marbury, holders of certain bonds or certificates issued by the Chesapeake and Ohio Canal Company, in 1836, to the creditors of the old Potomac Company, were made parties defendant.

All the defendants having answered, in June, 1868, the case was heard in the Court below, and fully argued on all the points involved, and in October, 1868, an opinion was filed by his Honor, Judge PINKNEY, in which he sustained an exception to the jurisdiction of the Court, interposed by the Canal Company, on the ground that the State of Maryland was a necessary party to the suit, without whose presence no final decree could be passed. In March, 1869, after further argument, a second opinion was filed by Judge PINKNEY, in which he held that an Act of Assembly was necessary to enable the State to appear to the suit, and an order signed directing the cause to stand over until such Act could be passed. By the Act of 1870, ch. 59, the Attorney General was instructed to appear and answer for the State, and in the event of an appeal, the clerk of the Court from which the appeal should be taken, was required to transmit the original papers to this Court.

Under the authority thus conferred, the Attorney General appeared for the State and filed an answer in her name and on her behalf. All the necessary parties being thus before the Court, and it being considered important and desirable that a speedy and final decision of the questions involved should be rendered, the case was submitted, upon bill,

answers, exhibits, and an agreed statement of facts, and a *pro forma* decree was passed, on the 31st of March, 1870, refusing the injunction and dismissing the bill. From this decree the complainant appealed.

A statement of the circumstances which gave rise to the bonded debts of the Chesapeake and Ohio Canal Company, whose priorities are the principal subjects of controversy, will contribute to the understanding of the interesting and important questions presented and determined in this case.

The charter of the Chesapeake and Ohio Canal Company, was in the first instance, granted by the State of Virginia, in the year 1824, and was shortly afterwards confirmed by the Congress of the United States and the Legislatures of Maryland and Pennsylvania. As originally incorporated by this concurrent legislation, the company had no express power to borrow money; but by an Act of the General Assembly of Virginia, passed on the 20th of January, 1844, confirmed by the General Assembly of Maryland, by the Act of 1843, ch. 124, and by Congress on the 7th of February, 1845, express authority was conferred on the President and Directors " to borrow money, from time to time, to carry into effect the objects authorized by the charter, to issue bonds or other evidences of such loans, and to pledge the property and revenues of the company for the payment of the same, and the interest to accrue thereon, in such form and to such extent as they might deem expedient, provided that nothing in said Acts should be construed to impair the prior rights or liens of the State of Maryland under *the mortgages* executed by the company to her, except in so far as the same might be waived, deferred or postponed by her Legislature."

Ten years prior to this, the State of Maryland had loaned to the company, under her Act of 1834, ch. 241, $2,000,000, and had obtained from it a mortgage of all its lands, tenements, works, property, rights, net tolls and revenues to secure this loan with the interest to accrue thereon, at the rate of six per cent. per annum. This mortgage was the *first* lien upon the property and revenues of the company.

By the Act of 1835, chap. 395, the State of Maryland subscribed \$3,000,000, and by the Act of 1838, chap. 396, \$1,375,000 to the capital stock of the company — exacting, however, as a condition to these subscriptions, a guaranty, after the expiration of three years, of a dividend of six per cent., payable semi-annually out of the profits of the company. This guaranty was duly executed—as to the Act of 1835, ch. 395, on the 21st of September, 1836, and as to the Act of 1838, ch. 396, on the 15th of May, 1839. In payment of these two subscriptions, amounting together to \$4,375,000, the State issued her bonds to the company, from time to time, upon which it was a further condition of the subscriptions, that it should pay the interest for the three years ending on the 1st of July, 1842. It failed, however, to meet this engagement, and the State was compelled to provide the sum necessary for the purpose, amounting to \$663,611.94. To secure this sum, the company, as required by the Acts of 1838, ch. 386, and 1838, ch. 396, executed on the 15th of May, 1839, mortgages to the State upon its property and revenues, which constituted the *second* lien upon them.

Before the end of the year 1841, the Canal had reached Dam No. 6, but the means of the company from loans and subscriptions were then exhausted, and the work was still fifty miles east of Cumberland, its destination. From 1841 up to 1845, but little was done beyond using the work as beneficially as possible, from Georgetown to Dam No. 6, but no effort was made from want of the necessary funds to continue its construction from Dam No. 6 to Cumberland. Its receipts were less than its expenses, its treasury empty and its credit exhausted. In this crisis of its existence, application was again and again made to the State for further assistance. Finally the Legislature, on the 10th of March, 1845, passed the Act of 1844, ch. 281. It authorized the company to borrow upon its bonds such sums, not exceeding \$1,700,000, as might be required to pay for the completion of the Canal to Cumberland. The bonds were to be made payable in not

less than thirty-five years, to bear not more than six per cent. interest, payable semi-annually on the first day of January and July, in each year, and to appear on their face, to be preferred liens on the revenues of the company; said bonds, without any preference or priority over each other on account of date, to be preferred liens on the revenues and tolls that might accrue to the company from the entire and every part of the Canal and its works between Georgetown and Cumberland, which revenues and tolls were pledged and appropriated for their payment, principal and interest.

The State expressly waived, deferred and postponed her prior rights and liens upon the revenues of the company in favor of these bonds, "so as to make them and the interest to accrue upon them preferred and absolute liens on said revenues, according to the provisions of the second section of the Act, until the bonds and interest should be fully paid." The proviso in the second section, subject to which the bonds thus authorized to be issued were to become preferred liens upon the revenues of the company, was, that "the President and Directors were, from time to time, and at all times thereafter, to have the privilege and authority to use and apply such portion of said revenues and tolls as in their opinion might be necessary to put and keep the said canal in good condition and repair for transportation, provide the requisite supply of water, and pay the salaries of officers and agents, and the current expenses of the company."

Authority was given to the company by the sixth section to execute any deed, mortgage or other instrument of writing, that might be deemed necessary or expedient, to give the fullest effect to the Act. The seventh section required the company to execute a new mortgage of its canal, lands, tolls and revenues to the State, subject to the liens and pledges of the Act, as an additional security for the payment of the $2,000,000 loan under the Act of 1834, ch. 241. In pursuance of the provisions of this Act of 1844, ch. 281, the company, in 1848, issued bonds, which are known as " Preferred

bonds," to the amount of $1,699,500. Of them, the State of Virginia, under her Act of March 7th, 1847, guaranteed $300,000. The proceeds were exclusively expended in finishing the canal from dam No. 6, west to Cumberland. On the 5th of June, 1848, the company, in pursuance of the sixth section of the Act of 1844, ch. 281, executed a mortgage in fee upon all the revenues and tolls of the entire canal and its works, between Georgetown and Cumberland, to Phineas Janney, W. W. Corcoran, Horatio Allen, David Henshaw, and George Morey, trustees of the bondholders, "to secure, after payment of the debts then existing, and that might thereafter be contracted and in arrear for repairs on the canal, and for officers' salaries, first the interest on the preferred bonds, semi-annually, &c." Some of the original trustees died, and others were duly appointed in their stead.

On the 8th day of January, 1846, the Canal Company executed, in conformity with section seven of the Act, a new mortgage to the State upon all its property, net tolls and revenues, to secure the two million loan of 1834.

Subsequently, that portion of the canal completed before the passage of the Act of 1844, ch. 281, viz: from Dam No. 6, east to Georgetown, absolutely needed repairs. The current receipts of the company were utterly inadequate for this purpose, and the Preferred bonds, by the terms of the Act, were exclusively applicable to the finishing of the work from Dam No. 6 to Cumberland. In this emergency, application was made to Virginia by the President and Directors in 1849 for a *loan* of $200,000, to be applied exclusively to the needed repairs. Instead of granting aid in the form requested, the Legislature of Virginia by her Act of March 15, 1849, authorized her Treasurer to guarantee the company's bonds to the amount of $200,000, provided her Board of Public Works should certify to him that they were satisfied that the payment of the principal and interest of such bonds, according to their terms, was "sufficiently secured," and provided certain other pre-requisites were complied with.

A question having arisen touching the power of the company to issue these bonds, and to make them as was designed, by a pledge of its revenues, superior and prior to the Preferred bonds issued under the Maryland Act of 1844, ch. 281—the legal opinion of Attorney General George R. Richardson, was called for by Governor Philip Francis Thomas upon the subject, and on the 28th of June, 1849, Mr. Richardson submitted to the Governor his written opinion affirming the existence of such corporate power. Accordingly, the Board of Public Works of Virginia, being satisfied that the payment of these Repair bonds was "sufficiently secured," so certified to the Treasurer, and the guarantee of Virginia was immediately given to them. They were at once issued, payable on the 1st day of July, 1869, with coupons for interest payable semi-annually, were sold at a premium, and the proceeds applied to the necessary repairs between Dam No. 6 and Georgetown.

It was charged in the bill that the company, not having sufficient means to meet the coupons on the Preferred bonds falling due on January and July 1st, 1851, and January 1st, 1852, made an arrangement with Selden, Withers & Co., bankers of Washington city, under which they agreed to take up these coupons, and to hold the same until the company should be able to redeem them, and the interest to accrue thereon in the meantime; the future revenues of the company, subject to certain existing priorities, being at the time expressly pledged to secure them; that in consequence of said arrangement, Selden, Withers & Co., took up and held the coupons of those dates, amounting to $143,000, for $140,000 of which the company afterwards issued to the firm certificates of debt bearing interest, payable semi-annually; that these certificates, with the coupons represented by them, were afterward transferred by Selden, Withers & Co. to the appellant, and that they constituted, in her hands, a lien upon the tolls and revenues of the company by virtue of the Act of 1844, ch. 281, and the mortgage executed in pursuance thereof.

It was further charged in the bill that the coupons on the Repair bonds, due July 1st, 1852, and amounting to $6,000, were paid by the company, but those on the Preferred bonds, amounting to $50,985, due on the same day, it was unable to pay; that it continued unable to pay the coupons on both Repair and Preferred bonds; and on the 29th of July, 1853, the Board directed the coupons on the Preferred bonds from July 1st, 1852, to January 1st, 1854, both inclusive, to be funded, by the issue of certificates bearing interest payable on the 1st of April and October. That the appellant, as guarantor of $300,000 of the Preferred bonds and $200,000 of the Repair bonds, having paid the coupons on the entire amount of $500,000, under the above resolution of the 29th of July, 1853, surrendered the coupons on the Preferred bonds so paid by her up to January 1st, 1854, inclusive, and received a certificate for $35,400. The coupons on the Repair bonds of January 1st and July 1st, 1853, and January 1st, 1854, which she also paid as guarantor, not being included in such resolution, were not funded, but were retained in her possession, and were not paid to her until December, 1869.

In August, 1867, the company paid the coupons of July 1st, 1852, and January 1st, 1853, upon the Preferred bonds which the holders had neglected to fund, as authorized by the resolution of July 29th, 1853, and also the interest upon the certificates from 1857 up to 1st of April, 1867.

The appellant continued to pay the coupons on the whole of the bonds guaranteed by her, both repair and preferred, from the first default of the company up to January 1st, 1861. From January 1st, 1861, to January 1st, 1865, she paid all the coupons that were presented, and since January 1, 1865, she has been, and still is, in default.

In December, 1869, the present administration of the company, finding that they had $160,000 of net revenue in the treasury, which they were anxious to distribute, and believing, from the written agreement of the principal bondholders, which was laid before them, that the mode of distribution

agreed on by them would be satisfactory to all the bond-holders, appropriated such sum without prejudice to the rights of any of the bondholders to the payment of the coupons of January 1st and July 1st, 1853, January 1st and July 1st, 1854, on the Repair bonds, being the oldest out-standing ones.

Also to the payment of the coupons on the Preferred bonds of July 1st, 1853, and January 1st, 1854, which were un-funded, and of the coupons of July 1st, 1854.

Also to the payment of the interest on the certificates of Selden, Withers & Co. to July 1st, 1854.

And also to the payment of the interest on the funded cer-tificates from 1st of April, 1867, to 1st of October, 1869.

Under the resolution of the Board making this appropria-tion, the aggregate sum of $58,435 was paid to the appellant.

An injunction, obtained at the instance of Mr. John S. Gittings, the Fredericktown Savings Institution, Lewis Mar-kell and others, having prevented the other bondholders from being paid as contemplated, an agreement in writing was en-tered into between the solicitors of the appellant and of the company, by which it was stipulated that the sums so paid to the former should not be held by her and appropriated to the several accounts upon which they were paid, but should be appropriated to such account as this Court should, in this case, decide to be proper.

In regard to certain creditors of the old Potomac Company, who were admitted as parties defendant in this case, it may be stated that said company assigned its charter to the Chesa-peake and Ohio Canal Company by deed of August 15th, 1828; the consideration of the assignment being the pay-ment by the Canal Company of the debts of the Potomac Company, amounting, as was supposed, to $175,800. In 1836, certain creditors of the Potomac Company who refused to invest in the stock of the Canal Company, surrendered their claims against the former, and received in lieu thereof the bonds or certificates of debt of the latter, for one-half of

the amount of their respective claims, upon the condition that they were to be in full satisfaction of all their claims against the late Potomac Company and the Chesapeake and Ohio Canal Company as assignee thereof. The interest on these bonds was regularly paid by the Canal Company to the 1st of January, 1841, since which time, it has paid nothing. The holders of certain of these bonds of the Canal Company, who were allowed to come in as defendants in this suit, claimed priority over all creditors of the Canal Company, upon the ground that they held a vendor's lien upon its property, and, therefore, upon its revenues.

The cause was argued before BARTOL, C. J., STEWART, BRENT, MAULSBY, MILLER and ALVEY, J.

*John P. Poe* and *Bradley T. Johnson,* for the appellant.

The $200,000 of Repair bonds guaranteed by Virginia, under her Act of the 15th of March, 1849, constitute the first lien upon the tolls and revenues of the Canal Company, and they should, therefore, be applied to the payment — first, of the over-due and outstanding coupons upon such Repair bonds in the order in which they fell due — that is, the oldest coupons first; and, after the payment of all the coupons, second, to the payment of the principal of the bonds themselves, all of which matured on 1st of July, 1869. *Parkhurst vs. Northern Central Railway Company,* 19 *Md.,* 472 ; *Garrett vs. May,* 19 *Md.,* 177 ; *White Water Valley Canal Co. vs. Vallette,* 21 *How.,* 414.

After the payment in full of interest and principal of the Repair bonds, the oldest outstanding coupons on the Preferred bonds are next entitled to be paid. These are the coupons due January 1st and July 1st, 1851, and January 1st, 1852, which were taken up and held by Selden, Withers & Co., under the arrangement with the Canal Company.

For these coupons, the company, on the 1st of December, 1851, gave to Selden, Withers & Co., two certificates or spe-

cial bonds for $50,000 each, and on November 17th, 1852, three other such certificates or special bonds for $20,000, $10,000 and $10,000 respectively—in all $140,000—for the payment of which, with interest thereon, the future revenues of the company, "subject to existing priorities," were expressly pledged; the coupons themselves being also retained by Selden, Withers & Co. as additional security. Upon the failure, of these gentlemen, in 1855, largely indebted to the appellant, these coupons and certificates for $140,000 were assigned and transferred to the appellant, and have since been, and are now held by her and in her possession as such assignee.

They collectively represent the oldest outstanding and unpaid interest on the Preferred bonds, which was never extinguished, nor designed to be extinguished, by the transaction between the Canal Company and Selden, Withers & Co., but was merely assigned and transferred to them; and these coupons and certificates, therefore, remain in the hands of the appellant a valid lien, by subrogation, upon the revenues of the company, to the same extent as the coupons themselves would be, if still in the hands of the original holders, instead of all being now in her possession as a *bona fide* holder for value from the parties who purchased them from these original holders. 1 *Hilliard on Mort.*, 535; *McGivern vs. Wheelock*, 7 *Barb.*, 29; *Walker vs. Stone*, 20 *Md.*, 198; *Brown vs. Topham*, 3 *Cush.*, 534; *Brawner vs. Watkins*, 28 *Md.*, 226; *Freeman vs. McGaw*, 15 *Pick,*, 82; *Morris vs. Oakford*, 9 *Barr*, 498; *Ellicott vs. Sleeper*, 2 *N. H.*, 525.

The outstanding coupons upon the Preferred bonds are then to be paid in the order of their maturity.

The coupons upon the bonds, both repair and preferred, bear interest from the dates of their respective maturity. *Fitzhugh vs. McPherson*, 3 *Gill*, 408; *Knox vs. Aspinwall*, 21 *Howard*, 539; *Wilson vs. Russell*, 13 *Md.*, 494; *Aurora City vs. West*, 7 *Wallace*, 105; *Gelpcke vs. Dubuque*, 1 *Wallace*, 206; 2 *Parsons on Bills and Notes*, 393; *Act of* 1844, *ch.*

281, *sections* 1, 2, 4 *and* 5, 10; *Hollingsworth vs. Detroit,* 3 *McLean,* 472; *Wright vs. Eaves,* 10 *Richardson Eq.,* 582; *Farwell vs. Sturdivant,* 37 *Maine,* 308; *Austin vs. Imus,* 23 *Vermont,* 286; *Little vs. Riley,* 43 *New Hamp.,* 109; *Sanford vs. Bulkley,* 30 *Conn.,* 344; *Mann vs. Cross,* 9 *Iowa,* 327; *Singleton vs. Allen,* 2 *Strobhart Eq.,* 166; *O'Neall vs. Bookman,* 9 *Richardson,* (*Law,*) 80.

The appellant is entitled to be re-imbursed the amount of the coupons upon the $200,000 of Repair bonds and $300,000 of Preferred bonds, which, upon the default of the company, she paid, as guarantor, with interest thereon, from the times of such payment, notwithstanding she has failed to make good her guaranty for some years past—and her default since the war in meeting her financial engagements is no reason why she should be prevented from recovering a debt confessedly due her for a guaranty faithfully and fully met before the war, especially as such debt, if now recovered, may aid her in re-deeming the guaranty which the desolation and disaster of civil war have temporarily disabled her from making good. 1 *Eq. Cases Abr.,* 93, *No.* 5; *Kunkel vs. Fitzhugh,* 22 *Md.,* 571.

The creditors of the Potomac Company now holding the obligations of the Canal Company, are at most, simple con-tract creditors of the latter company, without liens of any sort, and certainly not entitled to be paid until after the bond-holders and the mortgage claim of the State of Maryland are satisfied. *Bronson vs. Railroad Co.,* 2 *Black,* 524; *Mumma vs. The Potomac Co.,* 8 *Peters,* 285; *Hayden vs. Stewart,* 4 *Md. Ch. Dec.,* 280; *Watson vs. Bane,* 7 *Md.,* 117; *Schnebly vs. Ragan,* 7 *G. & J.,* 120; *Willis vs. Bryant,* 22 *Md.,* 373.

*Attorney General Jones,* for the State of Maryland.

The Canal Company had, and has, no authority to fund its unpaid interest coupons upon the bonds issued under the Act of 1844, ch. 281, whatever bonds the Court may hold to have been authorized.

Although, *inter partes,* interest which has accrued becomes a debt, and the parties may agree that it shall be considered principal and bear interest, (3 *Gill,* 408;) yet mortgagors cannot agree to compound interest and make it a charge on the mortgaged premises, to the prejudice of any portion of the mortgagees' debt secured by such mortgage, or to the prejudice of subsequent mortgagees of the same property. *Fitzhugh vs. McPherson,* 9 *G. & J.,* 51.

The extent of the waiver or postponement, by the State of Maryland, of its mortgages in favor of the bonds authorized, under the Act of 1844, ch. 281, to be issued with preferred liens on its revenues, to complete the canal to Cumberland, was expressly limited in the Act, by a proviso, "that the whole amount of bonds authorized to be issued *shall not exceed* the sum of $1,700,000. The Act was the subject of judicial consideration and construction by the Court of Appeals, in the case of *Brady vs. The State,* 26 *Md.,* 269.

Unless it can be shewn that the power to "apply such portion of revenues and tolls as in the opinion of the President and Directors of the company, might be necessary to put and keep the canal in good condition and repair," &c., includes the power to borrow money on bond and mortgage, and without the assent of the prior mortgagees, to create in favor of such bonds a first lien over all others on tolls and revenues afterwards to accrue, the complainant's claim to such priority on "the Repair bonds for $200,000, guaranteed by it," must fail. A mortgagor cannot, without the assent of a prior mortgagee, determine that the security of such prior mortgagee will be improved and rendered more available to such mortgagee, by borrowing more money for that ostensible purpose, and execute any form of contract or pledge, to take priority of such former mortgage.

If this view be correct, all the payments by the Canal Company of interest on what are known as Repair bonds, and for all certificates of indebtedness for interest accrued, have been misapplications of the tolls and revenues of the company.

And in any account to be taken between the appellant and the Canal Company, the State of Maryland and the preferred bondholders, the sums already received by the appellant, viz: some $22,000 in 1867, and $58,435 in December, 1869, must be credited to the interest on the Preferred bonds which it may show that it has paid on account of its guarantee thereof as aforesaid.

As to the claim of Virginia, as assignee of Selden, Withers & Co., the proceedings of the company show that the transaction was a loan by the firm, to enable the Canal Company to pay interest on its bonds; and that the company issued its bonds, "with the corporate seal of the company," for the money so borrowed. The interest coupons thus redeemed by the company were thus merged in the higher security—and the bonds create only a general indebtedness, and not a specific lien.

*Bernard Carter* and *Charles Marshall*, for the Chesapeake and Ohio Canal Company.

The object of this suit is to have a determination of the rights of the various lien creditors of the Chesapeake and Ohio Canal Company. The claim of the complainant, and the rights asserted by the various defendants, are stated clearly in the bill and answers, and with respect to most of them, the Canal Company has no interest other than to have the law applicable to these claims finally ascertained, so that the money now ready for distribution, and the future revenues of the canal, may be properly applied. There are several *classes* of creditors of the Chesapeake and Ohio Canal Company, and each *class* claims that the debts due to it constitute the first lien on the tolls and revenues of the company. The company therefore hope that all questions arising out of these conflicting claims may now be finally adjudicated, and that the Court may find it within the scope of its power and duty in the *present* case, to lay down a chart by which all future Boards of the President and Directors of the company may

Commonwealth of Virginia *vs.* Ches. & Ohio Canal Co., *et al.*

be saved from the perplexities with which they would be met in the absence of such judicial determination.

[The counsel for the Canal Company stated at some length the questions, which they considered were presented by the record, and submitted them, without argument, to the decision of the Court.—REP.]

*Frederick W. Brune* and *I. Nevett Steele*, for W. W. Corcoran and others, trustees under the deed of the 5th of June, 1848, and Isabella Brown and others, bondholders secured by said deed.

At the date of the passage of the Act of 1844, ch. 281, the State of Maryland was the virtual owner of the canal, and its entire property and revenues, by reason of the mortgages and liens given to the State by the canal for loans and subscriptions amounting to an aggregate of $10,000,000.

At that time the canal was finished as far as Dam No. 6, leaving a link to be completed, before the great object of reaching the coal fields around Cumberland could be attained.

To pay for the work on this unfinished link, it was found, would require at least $1,700,000, and this sum the State was entirely unable or unwilling to advance or assume, but looking to the extremity of the situation of the canal, and with it the State's large investment, the State agreed, in the Act of 1844, ch. 281, as a last alternative, to waive its liens to a limited extent, and upon certain conditions, for the purpose, if possible, of enabling the Canal Company itself to finish its work to Cumberland, by a pledge of its unencumbered revenues. This Act was therefore passed.

The holders of the bonds issued under that Act advanced their money, relying on the pledges and promises contained therein to be performed on the part of the State and of the company, and they are entitled now to claim the full benefit of such pledges and promises.

The preference and priority of these bonds under the pledges contained in the Act of 1844, and the mortgage of

the 5th of June, 1848, would be clear, but for the pretensions of the appellant, which claims a paramount lien for certain other bonds, termed " Repair" bonds, to the amount of $200,000, which it alleges are entitled to a preference of payment out of the revenues and tolls even to the Preferred bonds.

The State of Virginia has only paid a portion of the interest falling due on these bonds, leaving a large portion of the interest unpaid. The principal on these bonds has become due since the bill in this case was filed, and the first enquiry is: Has the appellant a paramount lien on the revenues of the Canal for the payment of these bonds or their interest, to the exclusion of the preferred bondholders?

We say it has not:

1st. Before the Act of Virginia, of Jan'y, 1844, confirmed by the Maryland Act of February 8th, 1844, the company had no authority to issue bonds nor even to borrow money, without the consent of a majority of the stockholders. *Act of 1824, ch. 79, secs. 4, 11.*

These two Acts contain a proviso that nothing in them shall be construed to impair the prior rights or liens of the State of Maryland, under its mortgages; but the same shall be held binding, and be accordingly respected, except in so far as the same may thereafter be waived, deferred or postponed by the Legislature of said State. There has been no legislation in Maryland sanctioning the issual of the Repair bonds which were guaranteed by the appellant under the Act of March 15th, 1849.

2d. By the first and second sections of the Act of 1844, ch. 281, the Canal Company was authorized to issue a limited amount of bonds, in a prescribed form, for the specific purpose of completing the Canal to Cumberland; these bonds are the Preferred bonds, and in favor of these particular bonds, thus to be issued, the State, not only in the fourth section of the Act of 1844, and in the language of the previous Acts, " waived, deferred and postponed its own rights

and liens," but it declared that it did so, "so as to make said bonds and the interest to accrue thereon, *preferred and absolute liens*" on the revenues of the company. And in the second section, the State further required that the bonds so authorized to be issued, should appear on their face to be preferred liens on the revenues of the company, and declared that the revenues from every part of the Canal from Georgetown to Cumberland, were pledged and appropriated to the payment of the same.

The Canal Company not only assented to this legislation but confirmed it by the deed of trust of June, 1848, authorized in the sixth section.

This Act was also recognized and ratified by the State of Virginia, in the Act passed March 8th, 1847, in which it guaranteed $300,000 of these Preferred bonds upon the condition that the completion of the Canal to Cumberland was to be thereby secured and their Board of Public Works satisfied, that the revenues of the Canal, after completion, "pledged by the Act of 1844, to the payment of the principal and interest of the Preferred bonds, should be sufficient for that purpose."

The State of Maryland has not passed or sanctioned any legislation changing or modifying the priority thus secured to the holders of these Preferred bonds, and we deny that either the State of Maryland, or Virginia, or the Canal Company, or all combined, could impair this priority, without the consent of the bondholders.

3d. There is nothing in the first section of this Act, referring to debts for repairs, which reserves the right to the company to issue the Repair bonds guaranteed by the complainant under the Virginia Act of March, 1849.

4th. The last proviso in the second section of this Act, does not authorize the company to issue the "Repair" bonds.

The privilege reserved to the company by that proviso in regard to the use of the revenues for repairs, &c., is confined to the application specifically of the revenues *when accrued*

*and received,* and cannot be tortured into an authority to issue bonds in anticipation of revenue.

5th. This construction upon the meaning of the State, in reserving to the company the right to apply the revenues in paying for repairs, is confirmed by the provisions of the third and fifth sections of the Act of 1844.

6th. If the right claimed for the Canal Company to issue the Repair bonds and give them a lien superior to the Preferred bonds, is in conflict with the provisions and intentions of the Act of 1844, this right is still more restricted and opposed, by the language of the mortgage of June, 1848, executed in accordance with the sixth section of said Act.

The second enquiry is, whether the appellant, as the alleged assignee of Selden, Withers & Co., is entitled to any, and if any, what lien or priority of payment, out of the assets of the company, derived from its tolls and revenues?

The appellees not only deny this priority, but maintain that these coupons can have no legal existence, but as vouchers or evidences of debt between the company and their bankers, Selden, Withers & Co., and making them only creditors, having no lien or claim on the revenues of the company until after the preferred bondholders and the State of Maryland are fully satisfied.

The appellees are entitled to the payment of their unpaid coupons, with interest from their maturity. The Act of 1844, in its first and second sections, secures the interest to accrue on the bonds as effectually as the bonds themselves, and it is well settled that the interest of a mortgage debt bears interest. *Murray vs. Larmer,* 2 *Wall.,* 122; *Thompson vs. Lee County,* 3 *Wall.,* 330–332; *Aurora City vs. West,* 7 *Wall.,* 105.

The Potomac Company cannot now maintain a vendor's lien against the Canal Company or its revenues; and no mere creditor or assignee of a creditor of the Potomac Company, can claim to enforce such a lien or piece of a lien, and particularly after the lapse of more than thirty years since the acceptance by such creditor of the Potomac Company, of the

obligations of the Canal Company in discharge of its claims on the Potomac Company, without even asserting, so far as the record 'shows, any claim to a lien or right to it, at the time of receiving such obligations. *Schwarz vs. Stein*, 29 *Md.*, 118, 119; *Hayden vs. Stewart*, 4 *Md. Ch. Dec.*, 280; *Watson vs. Bane*, 7 *Md.*, 117.

*George H. Williams*, for John S. Gittings, The Fredericktown Savings Institution, Lewis Markell, and others.

The imperative necessity to keep the canal in repair, makes it the duty first to apply the tolls for that purpose; and if tolls on hand do not suffice, then it is equally a duty to anticipate them by pledge; and to pledges so given for such purposes, all other pledges or mortgages are, of necessity, subordinate, and must yield.

If the Act .of 1844, ch. 281, properly construed, were against this duty, it would be violative of the rights of the public, whose lands were taken for purposes, which the Act would permit to be frustrated. Courts, therefore, will not give it such a construction as would work this result, unless there was no escape from it. But the Act, so far from being intended to work such results, adopts the correct principles .by preserving the preferences in favor of money lent for repairs.

The true construction of the Act then, and .the deed of trust securing what are termed the preferred bondholders, recognize the priority of loans for repairs, and, as a consequence, the Repair bonds are entitled to precedence. The Legislature did not, by this Act, design that the corporation should be permitted to disable itself from doing what was necessary for self-preservation.

Power (or duty rather) to use and apply revenue for repairs, includes power (nay, duty) to anticipate this revenue for such a purpose. Whether such necessity existed in fact, and who were the judges, (in the absence of *mala fides*,) of such necessity, are questions conclusively settled by the Act of Assem-

bly, which confines the management of the canal to its President and Directors, and were the contingency to occur by which the management should be transferred to the trustees, then they are directed how to apply its revenues, by the words "in the manner hereinbefore provided," and which means, "repairs first." *Gardner vs. London, Chatham & Dover Railway Co.*, 2 *Ch. App. Cases (Eng. Law Reports,)* 216, *A. D.*, 1867.

The State of Virginia, as the holder of such Repair bonds, is not entitled to any priority. As against other holders, by contract with them and the company, she has guaranteed their faithful payment according to their tenor. It is admitted that she is *in default*, and the payment of but a fractional part of her undertaking gives her no rights at law or in equity. She must be postponed until those holding her guaranty are paid in full. *Garnett vs. Blodgett*, 39 *N. Ham.*, 150; *Swann vs. Patterson*, 7 *Md.*, 170.

Selden, Withers & Co., not being original sureties for the Canal Company, were volunteers as to their alleged payment of coupons; and no contract (supposing there were any such) between them and the Canal Company, could subrogate them to the rights of creditors, whose coupons they paid. To such a contract, the holders of such coupons must have been consenting parties; and no such consent is to be imputed to a creditor who merely silently receives payment of his due. *Swann vs. Patterson*, 7 *Md.*, 170. As to when payment works an assignment, *vide Walker vs. Stone*, 20 *Md.*, 198. And no assignment by them to the State of Virginia, could give higher claims than they themselves possessed.

Moreover, the coupons were simple contract debts, which were merged by the acceptance of bonds under seal of the Canal Company; and acceptance of these sealed instruments worked an extinguishment of the coupon debt. *Moale vs. Hollins*, 11 *G. & J.*, 14.

The supplemental bill involving matter subsequently happening, and to which complainant was a party, and the object

of the bill being for the same purpose as these proceedings, the order for consolidation was improperly refused, and the cause should be remanded for that purpose. *Campbell's Case,* 2 *Bland,* 241.

*Benjamin Price,* for the Potomac bondholders.

The question submitted for decision then is, whether the bonds issued by the Chesapeake and Ohio Canal Company, under the 12th section of its charter, to the creditors of the Potomac Company, are not entitled to a priority in payment over all other debts of the company.

It is alleged that whatever might have been the rights of the Potomac bondholders originally, these rights have been changed by the Act of 1844, ch. 281, sec. 5. The holders of the Potomac bonds never gave their consent to this Act, nor was their consent ever asked.

The true character and meaning of the Act of 1844, ch. 281, is: The State having liens as creditor, and priorities as stockholder in the Chesapeake and Ohio Canal Company, waived her liens and priorities to such capitalists as were willing to complete the work from Dam No. 6 to Cumberland. The Preferred bonds, therefore, succeed to the State's priority and no more, and this is all the State intended to accomplish by that Act.

The Potomac Company assigned its charter to the Chesapeake and Ohio Canal Company, by its deed of August 15th, 1828, by the operation of which deed the Canal Company stood in the place of the Potomac Company, and was invested with all its franchises. *Canal Co. vs. Railroad Co.,* 4 *Gill & John.,* 108, &c.

The consideration of this assignment was the payment by the Canal Company of the Potomac Company's debts. This was authorized by the charter of the Canal Company. *Act of* 1824, *ch.* 79, *sec.* 12.

The amount of these debts were ascertained to be $175,800, and the Canal Company was required to pay towards these

debts the proportion which the revenues of the Potomac Company might bear upon an average of five years to the whole amount of $175,800. Some difficulty occurred in ascertaining the average of the Potomac Company's revenues. At length the Canal Company, at a general meeting of its stockholders, proposed that the average revenues should be assumed to be three per cent., and upon this basis the creditors agreed to settle, and the bonds or certificates of debt were issued as the creditors came in and signed their assent to the *terms* proposed. The consideration, then, was to pay the creditors of the Potomac Company, not the company itself.

These bonds, issued by the Canal Company, represent the price which it paid to the Potomac Company for the very site upon which the canal has been constructed, and the Canal Company paid interest on the bonds up to 1841, when it stopped for want of means.

This case, therefore, fulfils all the conditions upon which chancery raises, by construction of equity, a lien in favor of a vendor for the payment of unpaid purchase money. The moral foundation on which such a lien rests, exists in all its parts and incidents in this case. 2 *Story's Equity*, sec. 1219, 1224 *to* 1228; 1 *White & Tu. Eq.*, 65 *Law Lib.*, 233, &c.

The difference between this claim and that of a vendor's lien is that in this instance, it is not the vendor who claims, but the vendor's creditor, with whom the contract was made and to whom the consideration was given by the charter.

The only debt of the Canal Company which could interfere with the lien of the Potomac bondholders, was that which was authorized by Act of 1844, ch. 281, for the security of which a mortgage was executed by the Canal Company upon all its property and revenues. The bonds issued under that Act are called the " Preferred bonds," and are secured by the aforesaid mortgage.

The Potomac bonds are not secured by mortgage, and if they rested solely upon the doctrine of equity, which creates a lien in favor of unpaid purchase money, the lien would pre-

vail against the mortgage, and the case would be free from difficulty. *Charter*, sec. 3.

The preferred bondholders had ample and sufficient notice of the lien of the Potomac bondholders. *Ringold vs. Bryan,* 3 *Md. Ch. Dec.*, 496 ; *Price vs. McDonald,* 1 *Md.*, 497 ; *West vs. Reid,* 2 *Hare,* 259 ; *Jones vs. Smith,* 1 *Hare,* 43 ; *Cooper vs. Ferryhaugh,* 2 *Bro. C. C.*, 291 ; *White & Tu. Eq. Ca.*, 71 *Law Lib.*, 132, *et seq.* & 144 ; 1 *Story's Equity,* 399 *and* 400 ; *LeNeve vs. LeNeve,* 2 *White & Tu. Eq. Ca.*, 132, *et seq.*

Persons dealing with a corporation are bound to take notice of the stipulations of its charter. 21 *How.*, 441. Such notice is of the most conclusive nature, and is not susceptible of being explained away or rebutted. *Nelson vs. Allen,* 1 *Yerger,* 360 ; *Graves vs. Graves,* 1 *A. K. Marshall,* 165 ; *Moore's Ex'rs vs. Blackwell,* 6 *B. Monroe,* 67. The Canal Company solemnly contracted, by its charter, to pay these debts—can it accept a part and reject a part? *The Mayor, &c., of Lyne Regis. vs. Henley,* 1 *Scott's Rep.*, 44 *and* 45.

The property of these creditors has been taken from them without their consent. It is true as the Court says, in 14 *Peters,* 45, they have their remedy—but what remedy? The Potomac Company, their original debtor, can no longer be sued—that is determined in *Mumma's Case,* 8 *Peters,* 285. Their remedy, therefore, is against their substituted debtor— substituted against their consent. Now with this debtor they have agreed to accept the terms according to the arrangement made by the Legislature. This is a duty of the Canal Company made so by their charter. 1 *Barb. S. C., Rep.*, 289 ; *Smith vs. Chesapeake and Ohio Canal Co.*, 14 *Pet.*, 45.

The mortgage executed under the Act of 1844 is made to trustees. It was the special duty of these trustees to enquire into the facts affecting the title of the property mortgaged. Notice to the trustees is notice to the bondholders. *Astor vs. Wells,* 4 *Wheat.*, 487 ; *Jackson vs. Sharp,* 9 *John.*, 168 ; *Toft vs. Stephenson,* 9 *Eng., Law & Eq.*, 80 ; 1 *Hill., on Mort.*, 683, 684.

Commonwealth of Virginia *vs.* Ches. & Ohio Canal Co., *et al.*

The right of the Potomac bondholders is not only an equitable but a legal right. It is a part of the title of the Canal Company. *Platt on Con.*, 3 *Law Lib.*, 10 *to* 19, (*marg;*) *Burnett vs. Lynch*, 5 *Barn. & Cres.*, 596 ; 8 *Dowl. & Ryl.*, 368 ; 2 *Platt on Leases*, 5.

It is the duty of a Court of Equity not to decline to enforce rights for which there is no other remedy. *Bacon vs. Robinson*, 18 *How.*, 485.

MILLER, J., delivered the opinion of the Court.

After a persistent and successful struggle of more than forty years with many disasters and innumerable difficulties, the Chesapeake and Ohio Canal Company has at last received from its tolls and revenues a surplus over and above its ordinary expenses, applicable to the payment of its preferred or lien creditors. Under the proceedings in this cause a part of this surplus has been paid into Court, and the immediate question now to be decided is, to whom shall this fund be paid ? Inasmuch, however, as there is a confident and apparently well-founded expectation that there will hereafter be large and increasing revenues annually accruing, to be applied to the same purpose, all parties in interest desire an adjudication by this Court of the priorities of the several classes of creditors of the Canal Company, not only to the fund now to be distributed, but to such future earnings. Most of the questions that will necessarily govern future distributions, arise and must be decided in order to settle the proper disposition of the present fund. We shall, therefore, address ourselves to the decision of these priorities. The several classes of claimants, parties to this proceeding, and who are contesting priorities and preferences *inter sese* as well as against the State of Maryland, are :

1st. The holders of obligations or bonds to the amount of $56,896.48, issued to such of the creditors of the former Potomac Company as came in and accepted the terms offered by the resolutions of the Canal Company in 1834, for a portion of their several claims as then agreed upon.

2d. The holders of what are termed "Repair bonds," to the amount of $200,000, issued in 1849, guaranteed by the State of Virginia, due on the 1st of July, 1869, and bearing coupons for semi-annual interest.

3d. The holders of what may be termed "Preferred construction bonds," to the amount of $1,699,500, issued under the Maryland Act of 1844, ch. 281, due thirty-five years after date, with coupons for semi-annual interest, $300,000 of which were also guaranteed by Virginia.

The State of Virginia, having paid as guarantor part of the over-due coupons of each class of bonds, and being also assignee of the claim of Selden, Withers & Co., for payment of other coupons of the Preferred construction bonds, is complainant in the cause. The State of Maryland, the largest and most generous creditor of the Canal Company, has, by an Act of her Legislature, consented to be a party to the bill and submits her rights to the adjudication of the Court. All the legislation of Congress, of Virginia and of Maryland, chartering and aiding this corporation, is referred to and made part of the bill and answers. The necessities, resources, revenues, loans and financial condition of the Canal Company, from time to time, as set forth in the annual reports of its several presidents, with accompanying documents, are also spread upon the record, giving to the Court all necessary information to enable it fully to understand the important questions it is called upon to decide. A detailed statement of what is thus disclosed, constituting as it does a familiar part of the legislative, judicial and financial history of the State, is unnecessary and could not be given without protracting this opinion to an inordinate length. We shall content ourselves, therefore, with only such reference thereto as is essential to a fair understanding of the several legal points that have been argued and arise for decision.

1st. The holders of the obligations issued to the creditors of the Potomac Company assert for their rights, an absolute priority over all other claims. The argument for this pre-

Commonwealth of Virginia *vs.* Ches. & Ohio Canal Co., *et al.*

ference, in which there is most force, is that by its charter, and as a fundamental condition thereof, the Canal Company was bound and assumed the obligation to pay the claims of these creditors, in the mode prescribed by the 12th section of the Act of 1824, ch. 79. It is unquestionably true, that the assent of the Potomac Company, with the transfer of its property, rights and franchises, was essential to, and made a condition upon which the Canal Company obtained its corporate existence, and the provisions in the charter of that company in favor of the stockholders and creditors of the former company, could not be abrogated or impaired, without their assent, by any subsequent acts of the Canal Company, or even by any legislation conjoint or separate on the part of Congress, Virginia or Maryland. It is also true, that by such transfer the Canal Company received substantial and most valuable property, rights and privileges, and may be regarded as having held them clothed with a trust in favor of these creditors, to be performed in the mode specified in its charter. If these creditors, therefore, were now standing upon the terms of the charter, expressly or substantially executed, and had done nothing which could be fairly construed as a waiver or abandonment of the privileges thus secured to them, the preference now claimed could not be successfully resisted. But it was clearly competent for them to waive any lien or priority thus existing and protected, and if they have done so by accepting different terms, and another and different security for their debts, they have lost their preference by their own act, and can have no just cause of complaint. It becomes important, then, to ascertain what the charter of the Canal Company gave them, and what they have accepted and received. The 12th section of the Act of 1824, ch. 79, makes it " the duty " of the Canal Company, " so long as there shall be and remain any creditor of the Potomac Company, who shall not have vested his demand against the same in the stock of the Canal Company, (which the Act enables him to do) to pay such creditor or creditors *annually*, such dividend

34 v. 32

or proportion of the net amount of the revenues of the Potomac Company, on an average of the last five years preceding the organization of the" Canal Company, "as the demand of such creditor or creditors at this time, may bear to the whole debt of $175,800." By this, the sum of $175,800, the supposed aggregate amount of debts, is made the basis on which the dividend is to be apportioned. The net average revenues for five years being ascertained, it is easy to calculate what per cent. this would pay on the sum stated as the total amount of debts, and the same per cent. must necessarily be paid on the amount due the creditors respectively. *Smith vs. Chesapeake and Ohio Canal Co.,* 14 *Peters,* 47. Thus, if the net average revenue should be ascertained to amount to three per cent. on $175,800, then each creditor was to receive an annual payment of three per cent. on the entire amount of his claim, thereby making a permanent investment of his debt at an interest of three per cent. This was the extent of the responsibility assumed by the Canal Company, and no lien or preference was given to these creditors beyond the express terms of this contract or obligation. Now what have they accepted and received, and in what position as lien-holders do they now stand? From the face of the obligations or bonds issued to them, and now represented in this case, it appears that it having been found difficult to decide what were the net revenues of the Potomac Company, or whether, under a strict construction of the law, it had any net revenues, two resolutions were adopted by the Canal Company in 1834; by the first of which they offered to pay on the 1st of July, 1834, to such of the creditors of the Potomac Company as have not subscribed their claims to the stock of the Canal Company, *one-half* the amount certified to be due them under the second section of the Act of 1824, ch. 79, provided no such payment shall be made to any creditor who shall not, before a certain time, file in the office of the Canal Company his acceptance of *the terms* offered by this resolution, as a *full satisfaction* of his claims against the late Potomac Company and the Canal Company

as assignee thereof; and by the second, it was provided that the payment, thus authorized to be made, shall be paid out of the tolls of the Canal Company already received and which may not be indispensable for the completion of the canal below Dam No. 5, and if the disposable tolls on the 1st of July, 1834, shall not be sufficient to satisfy the demands then made, interest shall be allowed from that day until the whole amount admitted to be due under the first resolution, shall be paid, which interest shall be paid, *semi-annually*, out of the toll account, in preference to any other demand. Each of the creditors whose claims are now before us, signed his *acceptance* of the *terms* offered in these resolutions in *full satisfaction* of his claim against the late Potomac Company and against the Canal Company as assignee thereof, and received from that company its bond for one-half the amount of his debt, issued pursuant to a resolution passed on the 10th of October, 1835, with interest to be paid thereon half-yearly from the 1st of July, 1834. These bonds were actually issued to the several creditors, as they respectively came in from time to time and assented to the prescribed terms, between the 10th of June, 1836 and the 12th of November, 1845, and the semi-annual interest was paid upon them to the 1st of January, 1841. This statement of the case clearly enough shows there was a wide and substantial difference between what was secured by the charter and what was actually accepted and received. Instead of an annuity or perpetual dividend of a certain sum, on the whole amount of their respective claims, they agreed to accept part of the principal with semi-annual interest thereon, if not paid at a specified time, and received the bonds of the Canal Company as security therefor. Though called in the proceedings of the Canal Company, and even in the Act of 1844, ch. 281, an *adjustment* of their claims "*under* the 12th section*" of the charter, it was in fact a compromise and acceptance of substantially different terms, of different amounts and secured in a different way. Being accepted with full knowledge of all the facts, in legal effect and operation,

it constituted a waiver of any lien or priority these creditors may have had resting upon the terms of the charter and the character of the original transaction, and consequently, let in to absolute priority over such claims the mortgage to the State of Maryland, of the 23d of April, 1835, to secure its loan of $2,000,000.

But though these creditors have thus lost, by abandonment and waiver, any original lien or priority they may have held, we are yet of opinion they are entitled to the position in the order of preference, assigned to them by the Act of 1844, ch. 281, and to the extent there prescribed. The fifth section of that law in effect provides, that when the revenues of the Canal Company shall be more than sufficient to pay the interest due and in arrear on the bonds which that Act authorized to be issued, the sum of $5,000 shall be annually appropriated by the Canal Company, to pay the interest on the bonds issued to the creditors of the Potomac Company, and out of the surplus net revenues a sinking fund shall be provided for payment of the principal of the Preferred bonds. In the mortgage for the benefit of the preferred bondholders, the revenues and tolls are devoted in the same manner—1st, to pay the semi-annual interest on the Preferred bonds; 2d, to pay $5,000 annually to the creditors of the Potomac Company; and 3d, to provide the sinking fund before mentioned. By a fair and just construction of this Act, the State has, to this extent, waived its liens in favor of these creditors, and by operation of this law and the mortgage referred to, they have a valid lien upon the tolls and revenues of the canal to the extent of $5,000 per annum, prior to the liens of the State, but subsequent to the interest due and in arrear on the Preferred construction bonds. In our opinion, this is their true position in the order of priority, and this is the extent of their lien, and we accordingly so decide and adjudge.

2d. The rights of the holders of the $200,000 Repair bonds are next to be considered and determined. The history and purpose of this loan are fully set forth in the record.

It is sufficient to state here, that it appears to have been effected for the purpose of repairing and fitting for transportation that portion of the canal which lies between Dam No. 6 and Georgetown; that these repairs were absolutely essential to make that portion of the work westward from Dam No. 6 to Cumberland, for the construction of which the Preferred bonds issued under the Act of 1844, ch. 281, were applied, of any practical value whatever. In fact, the repair of this part of the canal seems to have been indispensable to the successful operation, if not to the very existence of the work, and the receipt of any revenue to be applied to the payment of any creditor. At all events, it is perfectly clear, that without these repairs, the security of the preferred bondholders, dependent upon tolls and revenue, would have been utterly worthless. The revenues actually received and in hand were wholly insufficient for the purpose. The loan was effected upon the guaranty of the State of Virginia. This guaranty was obtained upon the faith of a pledge by the company, of its revenues for their payment, and *not until* an opinion had been expressed by the Attorney General of Maryland, upon the question being submitted for his opinion by the Governor of the State, that the company had power to issue their bonds and pledge the tolls and revenue of the work for the purpose of raising money to *put and keep* the canal in good condition and repair, and that this pledge would make such bonds superior and prior, not only to the liens of the State, but also to the bonds issued under the Act of 1844, ch. 281. The bonds thus guaranteed were issued in 1849, were sold for a premium, and, as the record sufficiently discloses, the proceeds were applied to the contemplated repairs, and for purposes clearly covered by the terms of the last proviso to the second section of the law of 1844. Is the debt thus created entitled to priority over all existing liens? The counsel for the preferred bondholders deny the power of the company to effect such a loan, to issue such bonds, or to anticipate its revenues, by any borrowing of money for the purpose of repair on any

pledge of the same, so as to create thereby any priority over their lien. Their argument is, and of necessity must be, that the only power which the company had over this matter, was to use and apply from time to time, as revenues were actually received and in hand, so much thereof as might be needed for the purpose of repair. Is this position sound? By the Act of 1843, ch. 124, amending its charter, power was conferred upon the Canal Company, in express terms, to borrow money from time to time, to carry into effect the object of its charter, (chief among which was the construction of the canal and repairing and keeping it in order,) to issue bonds and and other evidences of such loans, and to pledge its property and revenues for the payment of the same, and the interest to accrue thereon, *in such form and to such extent as its* President and Directors, or a majority of them, may deem expedient; provided the prior rights and liens of the State of Maryland under the mortgages theretofore made *to it,* should not be impaired, and such mortgages should be held binding, except in so far as the same should thereafter be waived, deferred or postponed by the Legislature of the State. By the Act of 1844, ch. 281, the State waived its lien in favor of the Construction bonds, to be issued for the completion of the canal from Dam No. 6 to Cumberland, and declared them to be preferred liens on its tolls and revenues, which were pledged for payment of the same and the interest to accrue thereon; provided, however, "that the President and Directors of said company shall, from time to time, and at *all times* hereafter; have the *privilege* and *authority* to *use* and *apply* such portion of said revenues and tolls as, in their opinion, may be *necessary* to *put* and *keep* the said canal in good condition and *repair for transportation,* provide the *requisite supply* of water, and pay the salaries of officers and agents and the current expenses of the said company." It is too plain to admit of doubt, that by this Act the State waived her liens upon the tolls and revenues in favor of the application of so much thereof as might be necessary for repairs and

other purposes mentioned in this proviso. This reservation was inserted in the law for the very purpose of preserving the life of the corporation, by preventing, and, in effect, prohibiting alienation or suspension of vital powers by a stringent pledge of all its revenues and resources in favor of the Construction bonds about to be issued. To those about to purchase these bonds, the State, by this law, said, in effect, you shall have a lien on the tolls and revenues for payment of the principal and interest of your investments, but only on so much of them as shall remain after the objects mentioned in this proviso shall have been secured; in other words, the liens of the State are postponed to that of the bondholders, but before either shall be paid, the company shall have power to use and apply its revenues in such way as to preserve the existence of the canal, and keep it a living operative work, capable of earning tolls and revenues, and subserving the great public purposes for which its charter was granted. If, then, an emergency for repairs arises, to meet which the receipts from tolls and revenues are insufficient, can the company anticipate them and resort to the power granted by its charter, and issue bonds for the purpose, upon the faith and pledge of its after-accruing revenues, in preference to any other lien or claim thereon? Why not? It is very clear, that but for the exercise of the power to borrow money on such faith and pledge, the canal would long since have ceased to exist, and if the company has no such power now, the work may become useless and dead at any time. The proviso referred to certainly does not, in express terms, restrict the use and application thereby authorized, to receipts from tolls actually in hand when there is occasion for repairs, and it would be a narrow and illiberal construction so to confine it. There is nothing in the nature of this corporation, or the purposes intended to be subserved by it, that would warrant such a construction. On the contrary, our predecessors have said that though "it is a private corporation, as distinguished from a public municipal body, it is not of that ordinary kind

which is created merely for the pecuniary benefit of its stockholders, but like that of the Baltimore and Ohio Railroad Company, it was designed to promote great public interests, which were its chief objects, and to the accomplishment of which more than ordinary powers were granted, and *liberal rules* of interpretation for *its benefit* ought to be adopted in expounding *its privileges and rights,* for effectuating the designs of the Legislature, and securing the rights of the State in a work of such magnitude, and involving such vast public interests." *Brady vs. The State,* 26 *Md.,* 303.

The sovereignties that created this corporation, exerting in its behalf the right of eminent domain, taking from citizens their private property for its use, designed the construction and perpetual maintenance of a great public channel of internal and inter-State commerce, which they declared should be forever "esteemed and taken to be navigable as a public highway, free for the transportation of all goods, commodities and produce whatever, on payment of tolls to be imposed," and it would be strange if there could be found in any law passed for the express purpose of aiding its construction and maintenance, any provision restraining its power to avail itself of its revenues and resources in such a way as to secure its existence, or if by any law, any authority had been conferred or permission granted, so to bind itself by pledges of its tolls and revenues in favor of any class of creditors, as to disable it from doing what was essential to self-preservation, and thereby work its own destruction. Indeed, it has been argued with great force and upon high authority, that the Legislature could not authorize this corporation so to manacle itself, by any contracts, mortgages or pledges that it could not fulfil its duty to the public for the purpose of its creation, and that quite independently of any legislation, power must be deemed to be reserved for the purpose of keeping it a "living, going concern;" that like bottomry bonds, which avail for the benefit of all in interest, owners and mortgagees, and take precedence of all other claims, so loans for repairs vital to the

existence of an enterprise like this, likewise availing for the benefit of all interested, must also take precedence of all liens and incumbrances of every kind whatever; that the imperative necessity to keep in repair, as a claim above all other claims, makes it the duty of this corporation, first, to apply its tolls for that purpose, and if tolls in hand do not suffice, then it is equally its duty to anticipate them by pledge, and to pledges so given for such purposes, all other pledges and mortgages are of necessity subordinate and must yield. But without either assenting to or denying the correctness of the position thus broadly stated, the preference of these Repair bonds may, we think, be safely rested on the narrower ground of granted power. For, adopting those liberal rules of interpretation we are bound to apply, in construing for its benefit grants of powers and privileges to this company, we are of opinion the power to effect this loan, to issue these bonds and pledge the future accruing tolls and revenue for their payment in priority over the Preferred bonds and the liens of the State, is contained in the amended charter (Act of 1843, ch. 124,) and in the last proviso to the second section of the Act of 1844, ch. 281. It is said in behalf of the preferred bondholders, that this construction will defeat the objects of this Act of 1844, and the intent of all parties at the time of its passage, with whose rights that law professes to deal; that absolute preference was by that law given to the Preferred bonds, and the State waived its lien for their benefit only and for the specific amount of bonds thereby authorized to be issued; that every one supposed ample security was provided by this Act, for payment of the interest on the bonds thus preferred, and the ultimate payment of the principal protected; that the bonds profess upon their face to be preferred liens on the revenues of the company, and no one would have invested his money in them if he had supposed their security and priority could be impaired and superseded by a loan for repairs; that if this construction is to prevail, there is no limit to the power to effect loans for the same purpose, whenever

the company may deem it expedient to make them, which will supersede even the present Repair bonds themselves, and thus the security of the Preferred bonds, as well as the liens of the State, will be completely destroyed and all hope of ultimate payment of these debts will be lost. In answer to this, it may well be retorted, of what value would these Preferred bonds now be, or will they be hereafter, if the power to raise money by loan on the pledge of its revenues for the purpose of repair does not exist in the company? It cannot be doubted the only value they now bear, arises from the fact that the proceeds of the Repair bonds were expended in making repairs for their benefit, as well as of every other lien creditor, and from the fact, that since that period money has from time to time been borrowed on similar pledges and used for similar purposes. No doubt all parties, at the time the law of 1844 was passed, supposed the revenues of the canal, under the contracts which that Act required to be made, would be sufficient to subserve all the ends that law professed to accomplish, and that all regarded the security as ample; but here, as in a thousand other instances where investments have been made in enterprises of like character, the most confident expectations have been frustrated and the best founded hopes disappointed. All that in reason can be said, is that those who loaned their money on these bonds relied upon a security which they thought was sufficient, which they were willing to accept, but which has hitherto failed them. They took security only upon expected tolls and revenues, and only on so much of them as might remain after repairs and other expenses were first provided for. There is certainly no equity in the pretensions they now assert. But the conclusive answer to their whole complaint is, that by the face of their bonds they were referred to the Act of Assembly, a public statute of a State, under which they professed to be issued, and are in law chargeable with knowledge of all its provisions and of the true construction to be placed upon them by the Courts. And besides this, the mortgage taken for their

benefit, recites the proviso in the second section of this Act, as well as all its other provisions, and devotes the mortgaged tolls and revenues to their security only, "after payment of the debts now existing and that may hereafter be contracted and in arrear for repairs on the canal and officers' salaries." It is true, if an emergency shall arise for another loan, for the same purpose of repair, the power to effect it can be exercised, and, upon the construction we have given to the law, the debt thus created will have priority over all other liens, including that of the present Repair bonds, but it is not to be assumed this power will be *abused*, and, from the present condition of the work, it is reasonable to expect the receipts in hand from time to time will always more than suffice for everything needed for repair or contemplated by the proviso referred to. If, however, some unexpected calamity should again unfortunately befall the canal, the exercise of the power is confided to the *good faith* and *sound discretion* of those to whom the law has entrusted the management of the work, and clothed with the duty of protecting the interests of all who have invested their money in it. It is not necessary to pursue the subject further. After the best consideration we are able to bestow upon it, we are satisfied the construction we have given is correct, and accordingly adjudge and determine that these Repair bonds now constitute the first lien on the tolls and revenues of the Canal Company, and are entitled to priority of payment out of the fund in Court.

The principal of these bonds has fallen due since the bill in this case was filed. The State of Virginia was guarantor of the whole, principal and interest, and has paid but part of the interest coupons, remaining as to the rest and the entire principal, in default. By her contract of guaranty she, as well as the Canal Company, became indebted to the holders of the bonds, her contract being to pay them in case the company failed therein. The latter is, therefore, the principal debtor and the bondholders are creditors of both,

and it is the money of the principal debtor that is now to be distributed. In this state of case it is very clear, no part of this fund can be appropriated to the defaulting guarantor, until the claims of the common creditors of both are fully satisfied. The distribution must therefore be, first to the payment in full of all the over-due and unpaid coupons not taken up by Virginia, next to the principal of the bonds, and then Virginia must be re-imbursed what she has paid as guarantor.

3d. Having settled the priority of the Repair bonds, little need be said of the position of the Preferred construction bonds. That is so clearly fixed by the Act of 1844, ch. 281, as to require no comment. They stand next in priority, and the liens of the State have been expressly waived in their favor. Of these, $300,000 were guaranteed by Virginia, part of the over-due interest coupons on which she has paid, and as to the rest is still in default. The principal is not yet due. By the terms of the law, all the bonds are placed on the same footing, "without any preference or priority over each other on account of date," and a sinking fund is directed to be provided for the payment of the principal. The over-due interest on these bonds is, therefore, first to be paid, and the fair and just rule to be followed in making distribution for this purpose, is to pay *all* the outstanding over-due interest coupons, in the order of seniority, whether taken up and paid by Virginia as guarantor, or not. In such distribution as holder of the coupons paid on the bonds guaranteed by her, Virginia is entitled to share in payment *pari passu* with holders of unpaid and over-due coupons on those not guaranteed.

In this connection, it is proper to consider and dispose of the claim of Selden, Withers & Co., of which the State of Virginia has become assignee. In reference to this claim, the bill charges that the Canal Company, being unable to pay all the interest on the Preferred bonds, due January 1st and July 1st, 1851, and January 1st, 1852, made an arrangement with Selden, Withers & Co., by which it was stipulated the latter

should *take up* the coupons due on those days, and *hold them* until the company should be in a condition to *pay* and *redeem* them and the interest to accrue thereon in the meantime, the future revenues of the company being at the same time pledged to secure the same; that in consequence of this arrangement, that firm did *take up* and *hold* said coupons, thereby being *subrogated* to the rights of the original owners, amounting to the sum of $143,000 for $140,000, of which the company afterwards issued to them *certificates of debt* bearing interest payable semi-annually; that these certificates, with the coupons represented by them, have been transferred to, and are now held by, Virginia, and constitute a lien upon the tolls and revenues of the canal by virtue of the Act of 1844, ch. 281, and the mortgage in favor of the bondholders executed in pursuance thereof. The bondholders and the State of Maryland, in their answers, deny the complainant was, or is, entitled on account of such assignment, to any lien or priority over their respective claims.

From the proof adduced in support of the allegations of the bill, which must be stated somewhat in detail, it appears the Directors, finding their company would be unable to meet the interest on these bonds falling due January 1st, 1851, at a meeting of their Board, held November 17th, 1850, appointed, by resolution, a committee to *negotiate* and *procure for and on behalf of the company*, a loan or advance of such sum of money as would be required to *meet* and *discharge* such interest, with power to procure said loan or advance upon such terms, and with such agreements or arrangements in regard to the deposit of the revenues of the company as they may deem expedient, and authorizing their President to issue the necessary instructions for carrying the same into effect, and also to execute, with the common seal of the company, any bond or instrument of writing, he might deem proper or necessary for effecting and concluding the negotiation of said loan or advance. They also, at the same time, passed a resolution, that subject to existing priorities, sanc-

tioned and authorized by the Act of 1844, ch. 281, the revenues of the company hereafter to accrue, be pledged for the payment of the principal and interest of the loan or advance that may be obtained under the preceding resolution, and that, from time to time, as in his judgment it may be necessary or expedient, the President be authorized and required to issue requisitions for the payment of said principal and interest, until the whole of said loan or advance is paid. At a meeting held on the 8th of January, 1851, the President reported, that in pursuance of these resolutions, and *upon the terms* therein mentioned, the committee had arranged with Selden, Withers & Co. to make such *advance* as was required for *payment* of the January, 1851, coupons of interest, and that firm had advanced therefor the sum of $50,000 at legal interest, to be paid from time to time as the funds of the company would permit. He also read his correspondence with that firm and with the collectors at Georgetown and Cumberland, relative to the deposit of the revenues of the company with them; all of which was approved by the Board. At the meeting, held June 2d, 1851, the President stated he had conferred with the same firm in relation to *advances* required for *payment* of the interest falling due July 1st, and that they had expressed their willingness to *advance* the amount required on the *terms* and *conditions* of the advance made in January last; whereupon, similar resolutions to those of the preceding November, as to the execution of a bond and pledge of revenues, were passed in reference to the advance for payment of the July interest. On the 13th of November, 1851, Selden, Withers & Co., addressed a letter to the Board, in which they say: "On settlement of our bank books with your company, we find we have inadvertently returned to you as checks the coupons amounting to $93,000, which coupons we should have retained as security for our advances for interest on the Preferred bonds of the company. We request, therefore, the return to us of the coupons to the amount stated." This letter was read at a meeting of the

Board, held on the same day, and it was ordered that coupons on the Preferred bonds heretofore paid by that firm, and delivered to the Treasurer, to the amount of $93,000, be returned to them as requested, and that that amount of coupons be charged on the books of the company to that firm, the same having been heretofore credited to their account. At the same meeting, the President called to the notice of the Board the propriety of giving said firm *satisfactory security* for the money which they have advanced or may advance to *enable the company to pay the interest* on the Preferred bonds; and thereupon a resolution was passed that, after paying current expenses and the interest on certain specified loans for repairs, including the $200,000 Repair bonds, the tolls and revenues of the company are hereby pledged to the payment of all the money, and six per cent. interest thereon, which this firm have advanced or loaned, or which they shall hereafter advance or lend to the company, and that the President be authorized and required to issue, from time to time, requisitions for the payment of such money, and in consideration of the money expended for, and services rendered to the company by said firm, it is hereby resolved that the account of the company shall be kept with them, and the tolls and income of the company shall be deposited with and be disbursed by requisitions drawn upon them, until all the money which the company shall owe them shall be fully and fairly paid. At a meeting held January 2d, 1852, a letter of the firm bearing date the 1st of December preceding was read, in which they expressed a willingness to *advance* $50,000 for *payment* of the coupons due January 1st, 1852, under *resolutions heretofore passed* by the Board, and the president stated that at the request of the firm, and in compliance with the resolutions of *November*, 1850, and *June*, 1851, two bonds of the company each for $50,000, dated December 1st, 1851, payable on demand and bearing interest from the 1st of January, 1852, were issued to them on account of *advances* made and to be made by them for the *payment of coupons* of inter-

est on the bonds of the company, which was approved. At another meeting held December 8th, 1852, the president stated that on the 17th of November preceding, three other bonds, amounting together to $40,000, payable on demand with interest from the 1st of January, 1852, had also been issued to the firm in conformity to the *same resolutions* of November, 1850, and June, 1851, on account of advances made by them for payment of the coupons of interest on the bonds of the company. This is all the record discloses on the subject of the original character of this transaction. It was agreed, however, that certain notices in the National Intelligencer of that period should be regarded as in evidence, from which it appears the Canal Company, on the 6th of December, 1850, gave notice that the interest coupons due January 1st, 1851, both on the Repair and Preferred bonds, would be *paid* on presentation and delivery by Selden, Withers & Co., accompanied with a notice from that firm that they would pay the same at their banking house in Washington. A similar notice from the firm was published on the 21st of June, 1851, as to payment of the interest due July 1st, 1851, on both classes of bonds, and on the 25th of June, 1852, a notice was published from its Treasurer, stating the company would be compelled to suspend payment of the interest coupons due July 1st, 1852, on the Preferred bonds.

We have thus stated at length this proof, because it embraces all the information we have, and is probably all that can be now furnished of the origin and character of the transaction on which this claim is based, and it is entirely by this that its validity must be determined. It has not been argued, and could not be pretended, that the five bonds or certificates of debt, amounting, in the aggregate, to $140,000, issued to this firm under these resolutions, even if they contained a pledge of the revenues of the company for their payment, standing by themselves, apart from the coupons to that amount they are supposed to represent, constitute, as against the bondholders or the State, any valid prior lien. By them-

selves, they are simply contracts or obligations of the company, whose payment must be postponed to that of all existing liens. If, in their struggle and zeal to maintain its credit, the President and Directors of the company exceeded their powers and induced this firm to advance their money on the faith alone of these securities, that were and are now unavailing, it is a misfortune which a Court of Justice cannot remedy by depriving other lienors of their legal rights and priorities. The only plausible argument that can be urged in support of this claim, is that the original transaction effected a subrogation and substitution of these bankers, whose money was applied in paying the coupons, in the place and to the rights their owners held under the Act of 1844, and the mortgage in their favor. This right of subrogation is asserted not only against the holders of subsequently maturing and unpaid coupons, and the bondholders themselves, but also against the State of Maryland, who by waiver of her liens occupies as to these coupons and bondholders the position of subsequent mortgagee. It is manifest, however, to our minds, after a careful examination of all the evidence on the subject, that the original arrangement between the company and this firm, (even if an agreement between these parties alone to that effect could establish the priority, and work the substitution now claimed,) did not contemplate the *purchase* and *holding* by the latter of the coupons, in the same manner as they were held by their owners, but an *advance* or *loan of money to the company* on security of a pledge of its future revenues and for other considerations, to enable the *company* to *pay* and *extinguish* this portion of its interest debt. The money so applied was in fact the money of the company borrowed for that purpose. The resolutions and proceedings of the Board throughout speak of the transaction as a loan or *advance to the company,* and not until long after the January and July interest of 1851 had been paid, and the coupons delivered over to the Treasurer, was the idea of retaining them as security for the loan suggested by the firm, and clearly

nothing that was then done could affect the rights of other lienors, which supervened immediately upon payment of the coupons. Nothing can be found in the resolutions, on the terms and conditions of which the firm was willing and did make the advances, providing for retention of the coupons as security. They neither sought nor received any assignment of their liens from the parties whom they paid, nor any assent from them that their coupons should be so treated after payment, as to remain a lien in preference to those subsequently falling due. Mere payment to these creditors worked no such assignment and mere silent receipt of money due them furnishes no ground for presuming any such assent. In *Swan vs. Patterson*, 7 *Md.*, 164, a mortgage was assigned by the mortgagee to one party, and the equity of redemption by the mortgagor to another, who created subsequent incumbrances on the property and gave his notes, with an endorser as surety, to the assignee of the original mortgage, for interest due thereon. These interest notes were paid at maturity by the *endorser*, who claimed, by reason of such *payment*, to be subrogated, to this extent, to the rights of the original mortgagee, and, therefore, entitled to priority over the subsequent mortgage. He took no assignment from the original mortgagee and the Court rejected his claim, saying "it may be that when he endorsed these notes he supposed he would have the benefit of the security held by the creditor, but if this was his view he should have entitled himself to such indemnity by an agreement to that effect, or by an assignment *pro tanto*, when the notes were paid." The parties here by mere payment of the coupons certainly cannot occupy a more favorable position than did this endorser by payment of these interest notes. The cases are entirely analogous, and the law of the former must control our decision of this. Looking carefully to the whole transaction, we find it to be simply a *loan of money* to a *mortgagor*, by a third party in no way connected with the mortgage, on the credit of the *mortgagor* and on an agreed security given by him and accepted by the lender, which money was applied by the lender, under the directions

of the borrower, to the payment and discharge in part of the mortgage debt, no assignment of the mortgage being taken or asked by the lender either at the time of the loan or of the application of his money. We think no case can be found—certainly none has been cited—in which the doctrine of subrogation or of equitable assignments has been carried to the extent of protecting a party thus acting, against a subsequent mortgage. The cases of *Walker vs. Stone*, 20 *Md.*, 195, and *Brawner vs. Watkins*, 28 *Md.*, 226, are not in conflict with *Swan vs. Patterson*, and announce no doctrine nor establish any rule of equity within which the present case can be brought. Finding, then, that these coupons were, both in fact and in law, paid and extinguished by the Canal Company, with their money borrowed and applied for that express purpose, this claim to priority by substitution or subrogation must be and is rejected.

4th. The remaining question the case presents is, do the over-due interest coupons, of both the Repair and Preferred bonds, bear interest from their maturity, which is to be allowed payment out of the revenues of the company in preference to the claims of the State of Maryland? The Supreme Court, in a series of cases, have decided that where coupon bonds, like the present, payable to bearer, are issued by a corporation under proper authority, both the bonds and the coupons, by universal usage and consent, have all the qualities of commercial paper, and are negotiable instruments; that the coupons being written contracts for the payment of a definite sum of money on a given day, drawn and executed in a form and for the purpose of being separated from the bonds, may be sued on without producing the bonds to which they were attached, and that interest being due, as a general rule, on a debt from the time payment is unjustly neglected or refused, interest may be recovered from their maturity on such coupons. *Aurora City vs. West*, 7 *Wallace*, 82. The same thing has also been decided by the Courts of several States, and it may now be regarded as a settled doctrine of American law. Without questioning, but, on the contrary,

fully recognizing and adopting this law as applicable to cases *inter partes*—between the coupon holder and the debtor corporation, where the rights of no other parties are involved or affected—we yet consider the question now to be decided in this case, one of an entirely different character. It is not whether this interest could be recovered against the debtor company, but whether the State of Maryland has waived its liens, so as to allow it to be paid in preference to its claims. The State has not permitted that waiver to rest in parol, to be made out by inference from acts *in pais*, nor left it to the construction of verbal agreements, or even of deeds or other written instruments of that character. It is plainly expressed in a law passed by the Legislature, a public statute of the State, which is to be construed by the same rules that govern the interpretation of other statutes. It is true that in respect of its rights as stockholder in this corporation, and mortgagee of its property and revenues, the State stood in the same position as a private party, yet having dealt with those rights by a public Act of legislation, knowledge of which is to be imputed to every one, there is no reason why the terms of such a law should be extended by construction, beyond the plain, natural signification and import of the language used. It must be construed with a view to the *original intent and meaning* of its makers, to be collected from the language employed, and the occasion and necessity of its passage. *Canal Co. vs. Railroad Co.*, 4 *G. & J.*, 162. When application was made by the company to the Legislature in 1844, for further aid to complete the construction of the Canal from Dam No. 6 to Cumberland, the State had not only advanced in subscription for its stock, more than three and a half millions of dollars, but held mortgages and pledges of its entire property and revenues for loans and advances of over two millions more. Having these vast interests at stake, with these valid liens for several millions of dollars entitled to absolute priority over every other claim, the Legislature, unwilling to burden the people with further taxation for further loans, but still

desiring to aid the completion of the work, and yet to preserve as far as was consistent with the relief proposed to be given, the State's liens and priorities, said to the company, you may issue your bonds for a sum which shall *not exceed* one million seven hundred thousand dollars, and in favor of this debt, with interest to accrue thereon, the liens of the State upon the revenues of the canal shall be waived. This waiver is expressed in the 4th section of the Act of 1844, ch. 281, in these terms: "And be it enacted, that the rights and liens of this State, upon the revenues of the Chesapeake and Ohio Canal Company, shall be held and considered as waived, deferred and postponed in favor of the bonds that may be issued under the aforegoing sections, so as to make the *said bonds and interest to accrue thereon* preferred and absolute liens on said revenues, according to the provisions of the second section of this Act, until said *bonds and interest* shall be fully paid." This language is certainly plain and admits of but one construction. The *waiver* extends no further than the *preference* is created and allowed—the latter being made the exact measure of the former, and given to the "*said bonds and interest to accrue thereon.*" The term "interest" used in this connection, means nothing more than the *simple interest* that may accrue upon the *bonded debt.* It does not mean interest to accrue upon interest coupons the company might see fit to attach to their bonds. It is nowhere said in this Act that the liens of the State shall be waived in favor of compound interest, or allowance of interest upon interest to any extent, and there is no rule of construction that will permit us to interpolate into the statute words that will convey such a meaning. The construction which would extend this waiver to the limit now insisted on by the bondholders, has no more of equity to commend than it has of law to support it. It finds no sanction in any other part of the statute, nor in the occasion or necessity of the Act itself. Could we view the matter in the light of, and gather the intent of the framers of this Act at the time it was passed, from subsequent

events and misfortunes that have hitherto befallen the enterprise, and consider the hardships resulting from either construction, the preponderance of equity by no means rests with that upon which the bondholders insist; for if it be considered by them a grievance and a hardship that they have received no interest on their investments for many years, it is equally hard—and measured by the amount involved, much harder—that the State, as stockholder and mortgagee, has never received a cent from its vast expenditure of money in this undertaking. Unless, therefore, there is to be found some plain language in the statute by which the Legislature has said these bondholders may now receive more than a million of dollars in the shape of compound interest, or of interest upon interest, before anything shall be applied to the State's liens, there is no hardship in confining them, as to priority over the State, to their *debts* and *simple interest* thereon. Surely they cannot ask a Court of Justice to strain by construction the language of a law waiving the State's large liens for their benefit, in order that a result like this may be accomplished. But as we have said, the State having waived its priority only in favor of the liens created and sanctioned by the Act of 1844, ch. 281, in our opinion the language of the waiver clause in that law, (which is applicable to both the Repair and Preferred bonds,) will admit of no other construction than the one we have placed upon it. It extends to the bonded debts and simple interest that may accrue thereon until they are paid. It does not embrace interest on the over-due interest coupons of either class of bonds, and no priority, therefore, attaches in favor of any interest on these unpaid coupons.

This disposes of all the questions necessary to be decided, and settles the rights and priorities of the several classes of creditors, parties to this proceeding. It will be easy to state an account distributing the fund in Court and adjusting the rights of parties in accordance with these views. This fund and all like revenues hereafter accruing must, therefore, be applied, as follows:

Commonwealth of Virginia *vs.* Ches & Ohio Canal Co., *et al.*

1st. All the unpaid coupons on the $200,000 of Repair bonds, not paid and held by the State of Virginia as guarantor, must be first paid in the order of their seniority, then the principal of said bonds with interest thereon from the time they matured until paid, then the coupons on these bonds that have been paid by Virginia as guarantor.

2d. After the principal and interest of the Repair bonds have been paid as above stated, the revenues must then be applied, first, to payment of over-due and unpaid coupons on all the Preferred construction bonds in the order of seniority; and in this distribution those paid and held by Virginia, as guarantor of $300,000 of said bonds, are to share in payment *pari passu* with those unpaid and held by other parties, but, nothing in such distribution is to be paid to that State as assignee of any claim of Selden, Withers & Co. After the over-due interest has been thus liquidated the accruing interest on these bonds must be paid, and then $5000 per year to the holders of the bonds issued to the creditors of the Potomac Company, and then the sinking fund for the payment of the principal of the Preferred construction bonds must be raised, applied and paid in the mode prescribed by the 5th section of the Act of 1844, ch. 281.

3d. After the above stated payments shall have been made, the entire surplus revenues of the company must be applied in discharge of the principal and interest of the liens and claims of the State of Maryland.

We are of opinion the complainant is entitled to maintain this bill, and that the supplemental bill filed by Gittings and others, should be consolidated with the present proceedings. The *pro forma* order dismissing the bill will, therefore, be reversed and the cause remanded to the Circuit Court of Baltimore city for further proceedings in conformity with the views expressed in this opinion. The costs must be paid out of the fund in Court.

*Order reversed and cause remanded.*

(Decided 20th June, 1870.)