(Decided June 23rd, 1897).

## GEORGE W. GREEN *vs.* THE WESTERN NATIONAL BANK.

*Lien of Execution on Market Stalls—Subrogation—Priority Between Liens—Payment of First Lien by Holder of Third Lien—Appeal.*

An execution issued on a judgment becomes a lien on the interest of the judgment debtor in market stalls.

While an execution was outstanding, the judgment debtor, who had an equitable interest in certain market stalls subject to a mortgage, procured the payment of the mortgage partly by money obtained by him from A. as a loan, the title to the stalls being placed in A. It was adjudged by a decree from which no appeal was taken that the

stalls belonged to the judgment debtor subject to A.'s claims, if any, and they were sold under a bill filed by the judgment creditor. In the distribution of the proceeds of sale, *Held*, That the judgment creditor was entitled to priority of payment and that A., whose money had been used to pay off the first lien of the mortgage, was not entitled to be subrogated thereto, although he was ignorant in fact of the existence of the judgment lien.

Where there are two liens of different dates upon the property of A., and he creates a third lien thereon using the money derived therefrom in paying off the first lien, which is released and not assigned, then the second lien becomes entitled to priority and the holder of the third lien is not subrogated to the rights of the first.

Upon an appeal from an order distributing the proceeds of a sale, the original decree authorizing the sale is not open to review.

Appeal from an order of Circuit Court No. 2, of Baltimore City (STOCKBRIDGE, J.)    In 1892, one Charles Brown, being the owner of certain stalls in the Lexington and other markets, borrowed on the security of the same the sum of $2,000 from the Butchers' Mutual Protective Association. At the same time, Charles W. Brown, son of Charles Brown, subscribed for certain shares of stock in the association in his own name, as trustee, and the loan to Charles Brown was to be liquidated *pro tanto* by any payments made on the shares.    Afterwards Charles Brown borrowed an additional $500 from the association, making his total indebtedness $2,500.    This was secured by a mortgage of the stalls from Chas. Brown to the association executed in 1894, covering both loans, and also by a pledge of the shares subscribed for by C. W. Brown.    Chas. Brown had previously borrowed $250 from G. W. Green on the security of two of the stalls.    In January, 1895, Charles Brown died and Charles W. Brown and Emil Budnitz were appointed administrators of his estate, which consistsd only of the stalls. These were appraised in the inventory at $2,000.    In December, 1895, the administrators reported a private sale of the stalls to G. W. Green for $2,750 which was ratified. This was the amount of the liens on the property, viz., the mortgage to the association for $2,500 and the pledge to Green for $250.    The association released its mortgage to

the administrators on December 9, 1895.    At that time however, the association received in money only the sum of $1,086.97, because the payments previously made by Charles W. Brown, with his own money, to the association, on his shares of stock, amounted to $1,427.37, and served to reduce the mortgage indebtedness to that extent.    The above-mentioned sum of $1,086.97 was loaned by Green to Chas. W. Brown, for the purpose of paying off the mortgage.

By virtue of the administrator's sale the title to the stalls appeared to be in Green, free from the mortgage, but there was an agreement between him on the one hand and Brown and his partner on the other, by which the latter agreed to pay Green $1,200 for the stalls within two years and to have possession of the same in the meantime.

In November, 1895, the Western National Bank recovered a judgment against Charles W. Brown for $1,209.80. Execution was issued on November 29, and returned *nulla bona* on December 9.    The next day the bank filed a bill alleging that Charles W. Brown was the real owner of the stalls and asking for a sale thereof to satisfy its judgment lien.    After testimony was taken the Court below decreed, in October, 1896, that the title to the stalls was in Charles W. Brown, subject to the claims, if any, of Green, and directed a sale of the same.    No appeal was taken from this decree.    A sale was made and auditor's report A distributing the proceeds, amounting to $2,075, was ratified, by which the claim of the bank was allowed in full, and only a small dividend audited on the claim of Green against Brown for $1,200.    The Court sustained exceptions to account B stated at the direction of Green, in which he was allowed priority for the sum of $1,086.97, being the amount advanced by him for the purpose of paying off the mortgage to the Butchers' Association.

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE, PAGE and BOYD, JJ.

*Charles A. Briscoe* (with whom was *Fetter S. Hoblitzell* on the brief), for the appellant.

The ratified order in account A allows the appellant his lien claim of $250 on the Lexington market stalls Nos. 5 and 5½, but allows the judgment claim of appellee as a preferred lien, because of the issue of a *fi. fa.* which was placed in the sheriff's hands and returned *nulla bona* before the 9th of December, 1895. This fact giving appellee a prior lien over appellant's claim as reported by the auditor under the rulings in 6 *Har. & Joh.* 455, and 64 *Md.* 455. The question before the Court is a narrow one, and the history of the case would seem to furnish its solution.

At the time of the first loan to Charles Brown by the Butchers' Association, title in the stalls was in Charles Brown, deceased, and when he made the transfer to the association the evidence of the title being vested in the transferee under the ordinance, the *fi. fa.* of appellee could not affect its money value by way of lien even if such a right held under such license be a subject of lien by way of execution, because Charles W. Brown had no title, legal or equitable in the stalls, at that time.

It cannot be contended that appellee as Charles W. Brown's creditor obtained any lien upon the amount representing the payments made on the shares of stock in the name of Brown, trustee for Elenora Brown, under the judgment of *fi. fa.* issued, even if that money was in fact paid by him, such a writ of execution not having such force and effect on money due a debtor. A *fortiori* could not the appellee claim any lien on the *fi. fa.* on these payments, because they were hypothecated under the terms of the contract for the payment of the loan made to Charles Brown, and were first to be applied to its liquidation, which contract Charles W. Brown was competent to make and he was bound thereby.

The title, if any existed in Charles W. Brown, was derived under the pretended private sale made under the order of the Orphans' Court, December 4th, 1895, and he

only held title from the date of December 9th, 1895, the day when the mortgage indebtedness of the intestate Charles Brown was paid off, and prior to this date the writ of *fi. fa.* issued on appellee's judgment has been returned *nulla bona*, therefore, no lien could attach under that *fi. fa.* because Charles W. Brown only obtained title after it was dead, and to effect it by lien, if subject to lien by such issue of *fi. fa.* and placing in hands of sheriff, a new execution should have issued on or after December 9th, 1895. *Barry* v. *Kennedy*, 11 Abb. (N. Y.) N. S. 42; *Rose* v. *M. & C.*, 51 Md. 270; *Coombs* v. *Jordan*, 3 Bland. Ch. 315–6, 325.

The appellant was an innocent purchaser for value of the title held by the association from Charles Brown, deceased, without any notice whatever of the claim of appellee. When the Butchers' Association transferred its paper title received from Charles Brown to this appellant on the receipt of $1,086.97 by the order of the administrators of his estate, thereafter, under the operation of sec. 17, Art. 35, appellant held the evidence of title as its grantee.

There has been a total failure on the part of appellee to show any fraud of appellant in his connection with the proceedings in question or any collusion with Charles W. Brown or any other person whatever to hinder, delay or defraud his creditors. The appellant's loan obtained by fraud has by the ratification of auditor's account A been obsorbed to pay a debt of Charles W. Brown, to appellee, and it cannot be reconciled on any principle of law or equity n the absence of fraud or collusion of appellant, and it would be inequitable for the appellee to be permitted to profit by the fraud of his debtor under the circumstance. Appellant held the transfer of the stalls to secure the repayment of the advance of $1,200 to Charles W. Brown, without regard to the rights of the heirs and distributees of Charles Brown, or their creditors, and it would be inequitable to compel him to surrender the value of his title holding as assignee or transferee of the association, without reimbursing him of said sum advanced as a consideration of the

transfer.   Even if appellee had an equal equity upon this fund with appellant, as creditor of Charles W. Brown, the fact that appellant held the transfer under the circumstances would entitle him to be paid first out of the funds.

Again, it is apparent, that if the administrators had sold these stalls for the cash price they were sold under decree of this Court, subject to appellant's lien of $250 on stalls 5 and 5½, which sold for $300, it would not have been much more than what was required to pay off the mortgage to the Butchers' Association, after paying the expenses of a sale and costs of administration.   If the claim of appellant is allowed the priority over appellee's claim, it is evident the appellee is in no worse condition than he would have been if the appellant had not been imposed upon by the fraud of Charles W. Brown and induced to pay the $1,086.97 in liquidation of that mortgage balance, believing he was getting the title to secure the repayment, because the mortgagee could have enforced its claim by foreclosure.

Appellant having paid $1,086.97 of the money advanced to liquidate the mortgage to the Butchers' Association is in equity entitled to be substituted, or subrogated to the security of its mortgage as a prior lien to the appellee's judgment.   The law of substitution is not founded on contract or agreement, but upon the equitable powers of the Court.   It is in the nature of equitable relief to protect a meritorious creditor who has paid the debt of another, against loss and damage.   *Robertson, &c.,* 66 Md.   538, citing *Milholland's case,* 64 Md. 455.   Subrogation arises by operation of law whenever the mortgage debt has been extinguished by one other than the debtor who is entitled to redeem.   1 *Jones on Mortgages,* sec. 874.

The doctrine of subrogation is said to rest on the basis of mere equity or benevolence.   It is resorted to for the purpose of doing justice between the parties.   *Cheesebrough* v. *Milliard,* 1 Johns. Ch. 409; *Gans* v. *Thieme,* 93 N. Y. 225; *Long* v. *Long,* 19 S. W. Rep. 537; *Arnold* v. *Green,* 116 N. Y. 666; *Barnes* v. *Mott,* 64 N. Y. 397–401; *Stevens* v.

Md.]                    Argument of Counsel.

*Goodenough*, 26 Vt. 676 ; *Harnsberger* v. *Yancey*, 33 Gratt, 527 ; *Smith* v. *Doran*, 43 Conn. 244 ; *Robinson* v. *Leavitt*, 7 N. H. 13 ; *Muir* v. *Bergshire*, 52 Ind. 149 ; *Peare* v. *Egan*, 131 N. Y. 262 ; *Spaulding* v. *Harvey*, 129 Ind. 106.

One who loans money on a defective mortgage for the purpose of discharging a prior valid mortgage upon the same property, and the money is used for that purpose, is ordinarily subrogated to the rights of the prior mortgage. 1 *Jones on Mortgages*, sec. 874, c. sec. 835 ; *Scriven* v. *Hursh*, 68 Mich. 176 ; *Everton* v. *Central Bank*, 33 Kans. 352 ; *Creppen* v. *Chappel*, 35 Kans. 495 ; *Lockwood* v. *Moist*, 3 Nev. 138 ; *Hammond* v. *Barton*, 61 N. H. 53 ; *Byerly* v. *Humphrey*, 95 N. C. 151 ; *Bolman* v. *Lohman*, 74 Ala. 507 ; *Clark* v. *Clark*, 58 Miss.     ; *Flannery* v. *Utley* (Ky.) 5 S. W. Rep. 878 ; *Kitchell* v. *Mudgett*, 37 Mich. 81 ; *Edenburgh, etc.*, vs. *Lachan*, 88 Ind. 88 ; *Sidever* v. *Parey*, 77 Ind. 241.

Where money is loaned upon the security of what is supposed to be a valid mortgage, but which in fact is a forged and void mortgage and the money is so loaned for the purpose that a prior valid mortgage may be discharged, which is done, the mortgagee of the void mortgage may be subrogated to the rights of the prior mortgagee, there being no intervening liens or incumbrances. *Sheld*, sub.-sec. 1 and 8 ; 3 *Pom. Eq. Jur.*, 1211, note 1 ; *Bright* v. *Boyd*, 1 Story, 478–498.

*Creppen* v. *Chappel*, 35 Kan. 495, where a person pays a debt, which is secured by a mortgage, at the instance and request of the debtor, with the agreement that the person paying the debt shall have a mortgage lien upon the real estate then mortgaged to secure such debt, and a new mortgage is given but is void, the party purchasing the money may be subrogated to the rights of the original creditor.

˙ *Bolman* v. *Lohman*, 74 Ala. 507. The lender of money which is used in paying off a mortgage, or other incumbrance on land, is not entitled, on that account alone, to be

subrogated to the rights of the mortgagee, but if the money was advanced for the purpose of paying off the mortgage, with the just expectation of obtaining a valid security on the property for the repayment and it was used in paying off the mortgage, or if the mortgage given for its repayment is defective, or the money is used in paying off the mortgage debt was procured by fraud and misrepresentations, in these cases the lender is entitled to be subrogated to the security of the mortgage which his money has discharged.

*Sidener* v. *Parey*, 77 Ind. 241.    Where a creditor at the request of his debtor and relying upon his representations that there are no judgments against him or other prior liens against his real estate, except a mortgage, pays it off, and has satisfaction thereof entered and takes a new mortgage, and a judgment was in existence against the mortgagee, he is entitled to be subrogated to the security of the senior mortgage and to have the entry of satisfaction cancelled and his lien declared to be superior to and older than the judgment so disclosed.

*Joyce* v. *Darentz*, 45 N. E. Rep. 900.    Where land incumbered by mortgage has been sold by the mortgator for its full value, and the purchase money applied in satisfaction of the mortgage debt, equity will keep alive the mortgage security for the benefit of the purchaser and enforced for his protection as against incumbrances subsequent thereto and where the purchase money so applied is but a partial payment in the mortgage debt, the purchaser will be entitled to enforce the lien to the extent necessary for his reimbursement, when that will not interfere with the mortgagee's security for the unpaid balance.

*Mustain* v. *Stokes et al.*, 38 S. W. Rep. 758.    The owner of a homestead incumbered with a vendor's lien procured a loan with which he discharged the debt so secured, a few days later he executed notes for the loan, which recited that they were given for the price of the land, and with his wife he executed a deed to the lender, who reconveyed by deed,

which recited the retention of a vendor's lien to secure the notes. Shortly afterward the original vendor released his lien. *Held*, *prima facie*, that the lender was subrogated as to the vendee's lien, though no evidence was offered that when the loan was made the parties had intended a subrogation, or that they had then agreed that the loans should be secured by conveyance.

One, who at the request of another advances money to redeem or pay off a security in which the latter is interested or to the discharge of which he is bound, is entitled to be subrogated to the security. *Arnold* v. *Green*, 116 N. Y. 566 ; *Barnes* v. *Mott*, 64 N. Y. 397.

*W. Burns Trundle*, for the appellee.

PAGE, J., delivered the opinion of the Court.

This is an appeal from an order of the Court below ratifying an audit distributing the proceeds of the sale of certain market stalls, in the Lexington and Hanover Markets in the city of Baltimore.

The stalls were originally the property of Charles Brown, now deceased. In May, 1892, he borrowed $250 from the appellant, and to secure its payment pledged to him stalls Nos. 5 and 5½, in the Lexington Market. There is no controversy over this transaction. On the 24th February, 1892, the Baltimore Butchers' Mutual Protective Association loaned him $2,000 and on the 4th of April, 1894, the further sum of $500. To secure the payment of these two sums, amounting in the aggregate to $2,500, the association received a mortgage from Brown on all the stalls, and also the transfer of the licenses therefor on the books of the City Comptroller. At the same time, to comply with the rules of the association, Charles W. Brown, the son of Charles Brown, in his own name as trustee for Elenora Brown, his wife, subscribed for certain shares of stock of the association, and pledged them as additional security for the loan. In his lifetime Charles Brown paid no portion of this debt. Charles W. Brown, however, kept the stock paid

up, according to the rules of the association.    Brown states as the reason why the shares were subscribed for by him as trustee that the association required the borrower to become a member by subscribing for its stock, and his father not being " in a condition " to do so, he consented to take them as trustee for his wife, and pledge them for the debt of his father.    It was not insisted at the argument that the payments made by Brown on account of the stock was out of his wife's money, as Brown in his answer had alleged. There is no proof in the case that would enable us to find that Mrs. Brown's money was so used.    Although at the requirement of the association, she joined in the receipt to it for the amount standing to the credit of her husband, trustee, there is nothing in the record to satisfy us that she had any interest in the matter whatever.

In January, 1895, Charles Brown died and within a month thereafter, Charles W. Brown and Emil Budnitz qualified as the administrators of his estate.    On the 27th of November, 1895, the appellees recovered a judgment in the Baltimore City Court against Charles W. Brown for $1,209,80 with interest and costs, and on the same day execution by way of *fieri facias* was issued and reached the sheriff's hands two days later.    It is clear, that at the time of the issuing of this writ, the title to the stalls was in the administrators of Charles Brown, subject to the lien of George Green on stalls Nos. 5 and 5 ½ in the Lexington Market, and the lien of the Butchers' Association on all the stalls of the deceased in both markets.    On the fourth day of December, 1895, the Orphans' Court passed an order directing the administrators to make sale of the stalls.    The report of the administrators to the Orphans' Court fails to give the date of the sale made in pursuance of the order.    But Mr. Budnitz in his answer states that, it was made, reported and ratified before the ninth day of December.    He also testifies that Brown told him " two or three days before the report of sale," that Green was to be reported as purchaser, and acting on this he (Budnitz) prepared the report and

filed it. It was immediately ratified ; and " the appointment was *then* made for all the parties in interest to meet at his office on the ninth of December." That the sale was completed before that day is further borne out by a consideration of the purpose and plan Brown had in view. His purpose was to secure the title to himself; his plan, to have Green returned purchaser, so that the latter could hold the legal title until the loan was repaid ; and to effect all this, it was necessary when the time came for Green to advance the money and for the association to release the mortgage, that the title should be safely vested in Green. How long before the ninth of December the sale was made, is not material ; because if it was made at any time prior to that day, the lien of the appellant's judgment fastened upon the property. Nor is it proper to enquire whether upon the facts proved, the title became vested in Charles W. Brown. The Circuit Court by its decree of the sixth of October, 1896, so determined, and with the correctness of that decision, it not having been appealed from, we are not now concerned. *Phelps* v. *Stewart*, 17 Md. 242. This appeal having been taken from an order distributing the proceeds of sale, the original decree authorizing the sale is not open to review by this Court. *Newbold* v. *Schlens*, 66 Md. 590 ; *Porter* v. *Askew*, 11 G. & J. 351.

Brown's title having accrued prior to the return day of the writ, that is prior to the 9th day of December, if it be assumed that market stalls are such property as may be taken in execution, it is clear the appellees acquired a lien, subject to such prior liens as might exist. The fact that the Butchers' Association held a mortgage, whereby the legal title was in it, with only an equity of redemption in Brown, could not avail to defeat the lien of the execution. It could not be enforced at law, it is true, and because of that it is that the appellant had the right to seek the intervention of a Court of Equity in order that he may be paid his claim, after the prior lien has been discharged. " It is an established legal principle, that

a debtor's equitable estate in personal property cannot be seized and sold under a writ of *fieri facias*. The usual mode is, to issue a *fi. fa.*, cause it to be levied or returned, thus showing that his remedy at law has failed ; by which acts of diligence a creditor acquires, in the eye of a Court of Equity, a priority of right from the time his execution was placed in the sheriff's hands, and a Court of Equity will permit him to redeem the prior incumbrance or grant a decree for a sale." *Myers* v. *Amey*, 21 Md. 305.

We are of opinion there is nothing in the nature of the right or estate acquired by the purchaser of market stalls to exempt them from the lien of an execution. Such right is " in the nature of an easement in, not a title to, a freehold in the land ;   *   *   it is limited in duration to the existence of the market and is to be understood as acquired subject to such changes and modifications in the market during its existence as the public needs may require. The purchase confers an exclusive right to occupy the particular stalls, with their appendages for the purposes of the market and none other." *Rose* v. *M. & C. C. of Balto.*, 51 Md. 270. It is a valuable right, sold by the municipal authorities under the power conferred by the Legislature " to lease, sell or dispose of" it " in any manner and for any term " they may think proper. *Public Local Code*, Art. 4, sec. 678. It is transferable, may be given and taken as security for debts or sold ; and special provision is made in the City Code for the passage of the title. *Border State Savings Institution* v. *Wilcox*, 63 Md. 531. It is also an interest issuing out of the realty of determinate duration, such as the term of years for which it may be granted, or during the existence of the market. It is a chattel real and personal property (2 *Blackstone*, 386) ; and therefore liable for the debts of the owner and subject to seizure and sale under a *fieri facias*. 2 *Tidd's Practice*, 1039.

Subsequently to the sale, by appointment, Mr. Budnitz testifies the " parties in interest" met in his office on the ninth of December. At that time Green was chargeable

with full knowledge of the exact state of the title. He had actual notice of the mortgage and of the fact that the association held the license as collateral security only, for the payment of the debt due to it by Charles Brown. An examination of the records in the Orphans' Court would have informed him that the administrators had included the market stalls in the inventory of the estate, had obtained an order for the sale and had sold them, and reported him as the purchaser without his knowledge or consent. He knew he was not the owner of the stalls, and inasmuch as it was within his knowledge that Brown wanted to get the stalls free from the claim of the association, and the title in " some individual, where he could pay the money on notes when it came due," it required no especial astuteness to enable him to infer that whatever was done, was at the instigation of Brown himself. He states in his evidence he asked Brown " if the stalls were all right in his name and he said they were," and that satisfied him. He seems to have made no examination, either among the Orphans' Court proceedings or in the Comptroller's office. It was under these circumstances that on the 9th of December, the claim of the association was paid and its mortgage released. The release recites, " whereas all covenants, &c., have been performed and the whole sum of money and interest secured thereby has been paid, the said body corporate doth grant and release, &c." The receipt of the association is for $2,514.34, of which $1,086.74 was paid by the check of Green ; the residue was settled for by the receipt of Brown and wife for $1,427.37, the same being the amount to their credit on the books of the association. The amount so paid by Green's check was part of the $1,200 loaned to Brown and was so paid at Brown's request ; the residue of the loan was paid to Brown. At the same time Green obtained a transfer of the license from the association, and also entered into an agreement with Brown to sell the stalls to Brown's firm (Brown & Merritt) for $1,200, payable in two years, they to have the possession of them upon payment of that sum with

interest and the license and all expenses thereon.   It is not contended that Green acquired any title or interest in the property by the transfer of the license, superior to the lien of the execution.   It is also clear that up to the date of the sale by the administrators the equitable title to the stalls was in Charles Brown or his representatives ; and after that in Charles W. Brown.   So that when the mortgage was released, its lien was absolutely destroyed, and the lien of the execution became the first, unless upon some principle of equity Green can be subrogated to the lien of the mortgage.   Upon this point the counsel for the appellant have cited many decisions of Courts beyond the State, but we deem it unnecessary to enter upon an examination of them, for the reason that, as to a case of this kind, the proposition involved has been firmly settled by our own Courts, and, we may add, in conformity to the great weight of authority everywhere.   *Boyd* v. *Parker*, 43 Md. 201.

It may be premised, in view of the facts as we have stated them, that to hold the lien of the association still exists, would be to defeat the intent of the parties manifested by declarations and acts in the most unequivocal manner.   When Brown obtained the loan from Green, it was well understood by both of them that the money was to be used in procuring the release of the association's mortgage.   This was in fact accomplished by the release from the association. Green, who at the time knew or ought to have known the exact condition of the title, contented himself with taking as his only security a transfer of the license from the association, who, he was well aware, held it only as a security for its claim.   Why, it may be asked, should not be applied the rule, than which none is better settled, that " those who enter into contracts must be governed by them as made, according to their true intent and meaning, and must submit to the legal consequences from them ?"   *Boyd* v. *Parker*, (*supra*).

Can Green under these circumstances derive any aid from the doctrine of subrogation ?   That doctrine is not founded

in contract but is altogether a creature of equity, and only resorted to to afford relief to a meritorious creditor. It is never applied when by so doing it will work an injury upon other persons by destroying their legal or equitable rights. In *Milholland and Wilcox, Trustees*, v. *Tiffany*, 64 Md. 460, the Court says: "It may be applied on equitable principles in behalf of one who at the instance and request of the debtor pays a lien or incumbrance which he was under no legal obligation to pay, provided it does not interfere with intervening rights and incumbrances. It will not, of course, be applied against superior or equal equities." *Woollen's Extrs.* v. *Hillen*, 9 Gill, 185 ; *Com.* v. *C. & O. Canal*, 32 Md. 546; *Boyd* v. *Parker* (*supra*); *Clabaugh* v. *Byerly*, 7 Gill, 354; *Robertson* v. *Mowell*, 66 Md. 538.

For these reasons we think Green is not entitled to be subrogated to the lien of the mortgage.

Finding no error in the order of the Court below, it will be affirmed.

*Order affirmed with costs.*

(Decided June 23rd, 1897).